UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED
JAN 2 0 2005
Michael N. Milby, Clerk

| | |
|---|---|
| JESSICA AND KEVIN HAFSTIENN § <br> INDIVIDUALLY AND AS NEXT § <br> FRIEND OF TAYLOR HAFSTIENN, § <br> DECEASED § <br> § <br> VS. § <br> § <br> BMW OF NORTH AMERICA, L.L.C. § <br> AND BAYERISCHE MOTOREN § <br> WERKE AG § | NO. H-03-1646 |

## DEFENDANTS BMW OF NORTH AMERICA, LLC AND BAYERISCHE MOTOREN WERKE AG'S OPPOSED MOTION TO EXCLUDE EXPERT TESTIMONY OF REX B. MCLELLAN

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Now come BMW OF NORTH AMERICA LLC and BAYERISCHE MOTOREN WERKE AG (collectively "BMW"), Defendants in the above-styled and numbered cause, and file this their opposed motion to exclude the testimony of Plaintiffs' purported expert on spot welds, Rex B. McLellan. In support of their motion to exclude McLellan's testimony, BMW would respectfully show the Court as follows:

### I.   INTRODUCTION

This case arises from a two-car automobile accident that allegedly occurred on September 16, 2000, in The Woodlands, Texas. At that time, Jessica Hafstienn was driving her 1999 BMW 323i with her son Taylor Hafstienn as a passenger. At the intersection of Grogan's Mill Road and Millpark Drive, Jessica Hafstienn failed to yield right-of-way and was violently struck on the side by a Sierra GMC pick-up truck driven by Ross Hardin, who was traveling at an excessive rate of speed. According to the police report, Hardin's pickup was

traveling 73 miles per hour in a 45 mile per hour zone at the time of the accident. Plaintiffs have sued BMW of North America, LLC and Bayerische Motoren Werke AG under a variety of theories including negligence and products liability. Plaintiffs have designated Rex B. McLellan to testify regarding spot welds in the BMW 323i. His testimony should be excluded under the *Daubert* standard.

## II.     ARGUMENT AND AUTHORITIES

### A.     Standards Governing Admissibility of Expert Opinions

In *Daubert v. Merrill Dow Pharmaceuticals. Inc.*, 509 U.S. 579 (1993), the United States Supreme Court addressed the principles applicable to determining the admissibility of opinion testimony offered by expert witnesses under the Federal Rule of Evidence 702. *Daubert*, 509 U.S. at 589. Rule 702 allows a qualified expert to testify "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. An expert's testimony must rest both on a reliable foundation and be relevant to the task at hand. *Daubert*, 509 U.S. at 597. If an expert's testimony is not based on reliable scientific knowledge, or if it is based on such knowledge but fails to relate to any material facts, then it is not useful and, therefore, not relevant. The proponent of the evidence bears the burden of establishing its admissibility by a preponderance of the evidence. *Id.* at 593.

The trial court has the obligation and broad discretion to be the "gatekeeper" in determining the reliability and relevance of the proposed evidence. *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 141 (1999). As gatekeeper, the trial court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice

2

of an expert in the relevant field. *Id.* at 152. In fulfilling its obligation as gatekeeper, the trial court must conduct a two-tier analysis of the expert's work. The first tier of the analysis requires an examination of the reliability of the expert testimony, based on: (1) the qualifications of the expert;; and (2) the grounds upon which the expert bases his opinion. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997), *citing Cummins v. Lyle Indus.*, 93 F.3d 362, 367 (7th Cir. 1996). The focus is on whether the reasoning or methodology underlying the testimony is scientifically valid and can be properly applied to the facts in issue. *Daubert*, 509 U.S. at 592-93, 113 S. Ct. at 2796. Rule 702 provides guidelines to aid the trial court in ascertaining the validity of the opinion: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methodology; and (3) the witness has applied the principles and methodology reliably to the facts of the case. FED. R. EVID. 702; *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371-72 (5th Cir. 2000); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 n. 1 (4th Cir. 2001). Other non-exclusive factors include: (1) whether the theory has been/can be tested; (2) whether the theory has been subjected to peer review and publication; (3) the potential or known rate of error; (4) whether the theory has been generally accepted; (5) whether the theory is from litigation or naturally flowed from research; (6) whether other alternative explanations have been ruled out; and (7) whether the proposed expert sufficiently connected the proposed testimony with the facts of the case. *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 686-87 (8th Cir. 2001).

In the second tier of *Daubert* analysis, the trial court must also determine that the testimony "fits" the case before it; that is, the evidence will assist the trier of fact by being relevant to the issues raised in the case. FED. R. EVID. 702; *Daubert*, 509 U.S. at 591-92; 113 S. Ct. at 2795-96. As the Fifth Circuit Court of Appeals has explained, "the trial judge ought to

3

insist that a proffered expert bring to the jury more than the lawyers can offer in argument. Indeed, the premise of receiving expert testimony is that it will assist the trier of fact to understand the evidence or to determine a fact in issue." *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1231, 1233 (5th Cir. 1986). The expert must testify to something more than what is obvious to a layperson to be of any assistance to the jury. *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998). Just because a witness is an expert in one field does not mean that the expert may testify in all aspects and specialties of that field. *See Wilson v. Woods*, 163 F.3d 935, 937-38 (5th Cir. 1999) (fire reconstruction and investigation specialist was not allowed to testify regarding automobile reconstruction); *Perkins v. Volkswagen of Am., Inc.*, 596 F.2d 681, 682 (5th Cir. 1979) (mechanical engineer who had no experience designing automobiles was not allowed to testify as an expert on automobile design).

### B.   McLellan's Testimony Should Be Excluded

Plaintiffs have designated McLellan to testify regarding the spot welds of the BMW 323i. Any such testimony should be excluded because it is unreliable and without a scientific basis. McLellan is not qualified to render such testimony and it is not based upon any scientific basis, but rather McLellan's common sense and "logic." This testimony should also be excluded because it will not assist the jury.

#### 1.   McLellan is a Professional Witness, Who Is Not Qualified to Testify

McLellan is a paid professional witness with no real world experience in the area of automobile manufacturing to be qualified to testify in this case. Instead, McLellan is a professional witness, who has been testifying for pay in lawsuits for 27 years. ( Ex. "A," Deposition of Rex B. McLellan taken May 5, 2003, at p. 4). During this time, he has given over 250 depositions. (Ex. "A" at pp. 8-9). Almost all of his testimony has been on behalf of plaintiffs

4

in product liability lawsuits. (Ex. "A" at p. 22-23.) In the last 10 years, all of the times that he has testified in automobile litigation it has been on behalf of plaintiffs suing automobile manufacturers. (Ex. "B", deposition of Rex B. McLellan, taken November 16, 2004, at pp. 45-46.) McLellan is a "jack-of-all-trades" expert, who has testified regarding a variety of product defects including those in down-hole equipment in the oil and gas industry, medical implants, lifting equipment, and airplanes. (Ex. "A" at p. 26). Thus, all of his background is entirely litigation-driven.

McLellan has no "real world" expertise, that is, in any way related to this case. He does not have a degree in automotive engineering. (Ex. "A" at p. 39). He has never designed an automobile. (Ex. "A" at p. 40). He has never worked for a company engaged in the design, manufacture or assembly of automobiles (Ex. "A" at p. 40). He has never designed any automobile components and has no patents on any automobile components used in the market place. (Ex. "A" at p. 41). He has never been responsible for quality control of an automobile manufacturer. (Ex. "B" at p. 23.) He has never been responsible for establishing the procedures or protocol for quality control for an automobile manufacturer. (Ex. "B" at p. 23-24.) He does not know the quality control procedures for spot welding for any other automobile manufacturer. (Ex. "B" at p. 24.) He does not know any other automobile manufacturer's standards for spot welding to compare to BMW. (Ex. "B" at p. 24.) He has never been employed to design welds or spot welds for an automobile. (Ex. "B" at p. 61.) He does not have any expertise in side structure strength or crashworthiness of an automobile. (Ex. "B" at p. 127.) He has never been a design engineer or established the locations for spot welds for an automobile. (Ex. "B" at p. 136.)

344911.1

He is not a member of the Society of Automotive Engineers or the American Society of Mechanical Engineers. (Ex. "A" at p.136). He is not an expert in the field of biomechanics or accident reconstruction. ( Ex. "A" at pp. 42-43). He is not a member of The American Welding Society. (Ex. "B" at p. 136.) He has never published in the area of welding requirements for automobiles. (Ex. "B" at p. 47.) He has never written any publication for The American Society of Mechanical Engineers or The Society of Automotive Engineers. (Ex. "B" at p. 47.) He is not a member of The American Iron and Steel Institute or any ANSII Standard Groups. (Ex. "B" at p. 48.) He is not a member of any group or society involving the welding standards for automobiles. (Ex. "B" at p. 48.)

In fact, he has never personally observed the manufacture of a BMW 323i or any other BMW vehicle. (Ex. "A" at pp. 40-41). He has never been employed in a position to design the spot welds for a vehicle. (Ex. "A" at p. 40). He has never examined the spot welds on a BMW 323i that had not been involved in a crash. ( Ex. "A" at p.41). The only time he has studied spot welds on automobiles is in litigation. ( Ex. "A" at p.42). He has never actually done a spot weld on an automobile. ( Ex. "A" at pp. 143-144). He has never been the person responsible for determining the location of welds in the manufacture of an automobile, nor does he have any other real world experience with regard to such welds. ( Ex. "A" at p.171). No automobile manufacturer has ever used his tests regarding spot welds. (Ex. "B" at pp. 55-56.). He has never done any rupture testing on a spot weld on an automobile outside of a litigation setting. (Ex. "B" at p. 90.).

McLellan has no practical real world experience regarding automobile manufacturing, design, and marketing and should not be permitted to testify. Just because a witness has experience in a general scientific area does not mean that the expert may testify

in all aspects and specialties of that field. See, e.g., *Perkins v. Volkswagen of Am., Inc.*, 596 F.2d 681, 682 (5th Cir. 1979) (mechanical engineer who had no experience designing automobiles was not allowed to testify as an expert on automobile design); see also, *Wilson v. Woods*, 163 F.3d 935, 937-38 (5th Cir. 1999) (fire reconstruction and investigation specialist was not allowed to testify regarding automobile accident reconstruction). McLellan's only experience is litigation-driven, and he is not qualified to testify in this matter.

### 2. McLellan's Testimony Has No Scientific Basis and Would Not Assist the Jury

Even if McLellan where qualified to render an opinion in this case, his entire theory is based upon speculation and is unsupported and unreliable. McLellan's opinions are vaguely set out in his reports in this case. He states that deficiencies in the locations of the spot welds in the BMW's body made the vehicle less "crashworthy" than a similar vehicle without such deficiencies. McLellan concluded that the BMW was therefore "unsafe with respect to the foreseeable crash scenarios...." Neither McLellan's observations nor his conclusions are admissible under the *Daubert* standard.

McLellan's inspection of the BMW consisted of observing the condition of a few spot welds and measuring their distance to the edge of the metal. McLellan performed this inspection on approximately 62 of the more than four-thousand seven hundred (4,700) spot welds on the BMW (.01 %). (Ex. "A" at p. 49). Of the sixty-two spot welds, McLellan found 26 he considered defective. (Ex. "A" at p. 75). Of the three indicators for the strength of a weld (nugget size, base metal tear out, and edge weld), McLellan concluded that both the nugget size and base metal tear out supported the conclusion that the welds were good or effective. (Ex. "A" at pp. 78-79). Instead, he only found that these 26 spot welds were located too close to the edge of the metal sheet. McLellan arrived at these conclusions by measuring this

distance and comparing this number to the BMW specifications. He has examined only 41 spot welds on exemplar vehicles and found 10 of those that did not meet his criteria. (Ex. "B" at p. 68.) Thus, in total, he examined 62 of the more than 4,700 spot welds on the Hafstienn vehicle and a total of 41 of the 4,700 spot welds on the exemplar vehicle to reach his conclusions. (Ex. "B" at pp. 96-97.)

Based upon this examination, McLellan testified that it is "common sense" to assume that if some of the welds were misplaced, that the other welds that he did not examine were defective as well. ( Ex. "A" at p.118). However, he has no scientific evidence to support this claim. Based upon this speculation and surmise, he concluded that the vehicle was less crashworthy under his own definition. ( Ex. "A" at pp. 119-120). He has done no testing to support this conclusion and relies upon none. ( Ex. "A" at p. 42). None of the papers or publications cited in his report deal directly with the location of spot welds in automobiles. ( Ex. "A" at p.133). His entire theory is based upon "logic" and not any peer reviewed publication that would support any type of methodology to support his findings. (Ex. "A" at p.168). There is no rate of error or other calculations upon which his theories are based. ( Ex. "A" at p.169).

He has no knowledge of the spot welding standards for any other automobile manufacturer. (Ex. "B" at p. 98.) He cannot compare the number of welds in the Volkswagen Passat that was used in the crash test with the welds on the BMW at issue. (Ex. "B" at p. 104.) He does not know of any scientifically reliable, peer reviewed literature that states that edge distance is an important consideration in evaluating a spot weld. (Ex. "B" at p. 113.) He is not aware of any National Highway Traffic Administration requirement or Society of

Automobile Engineering discussion concerning the edge requirements for spot welds that would support his theory. (Ex. "B" at p. 121.)

Put simply, McLellan is not qualified to testify regarding the spot welds, and the basis for his opinion regarding the placement of the spot welds on the subject BMW 323i vehicle is not sound or scientifically based. It has not and cannot be verified nor does his supposed methodology take into account the specific factors involved in the accident and is completely unreliable. See, e.g., Seatrax, Inc., 200 F.3d at 372 (failure of appraisal expert to conduct independent analysis of valuation figures was one of the "insurmountable obstacles" in party's attempt to qualify him as an expert); Boyd v. State Farm Ins. Co., 158 F.3d 326, 331 (5th Cir. 1998) (without more than an his credential and subjective opinion, an expert's testimony which lacks the materials or data that the opinion is based upon as well as the reasoning process underlying that opinion is inadmissible); Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1115-16 (5th Cir. 1991) (overruled on other grounds by Daubert) (witness's "scientific hunch" which is unexplained or unsupported by any methodology that witness utilized to reach his opinion is not admissible).

In an opinion issued on December 31, 2004, the Texas Supreme Court found that the jury would not be assisted by the unreliable opinion of an expert who failed to conduct tests, cite studies, or perform calculations in support of his theory, which was not peer-reviewed. Volkswagen of Am., Inc. v. Ramirez, ___ S.W.3d ___, 2004 WL 3019227 at *3 - *5 (Tex. 2004). In Ramirez, plaintiffs alleged that a bearing defect in the left rear wheel of the Volkswagen Passat driven by Haley Sterling caused her to crash into a second vehicle, a mustang, oncoming from the opposite direction of the Passat. Id. at *3. According to Plaintiffs, the left rear wheel of the vehicle detached yet stayed tucked in as Sterling lost control of the

Passat, which crossed the concrete median. *Id.* The issue was whether the damage to the wheel had occurred before or after the crash. *Id.*

Ronald Walker, plaintiff's accident reconstructionist in *Ramirez*, theorized that the accident occurred because of a defect in the vehicle rather than driver error. *Ramirez*, ___ S.W.3d ___, 2004 WL 3019227 at *3. According to Walker, the wheel of the Passat detached before the crash but was able to stay in the rear wheel well as the Passat traversed over the median, collided with the mustang, and partially spun. *Id.* To explain his conclusion, Walker cited to the "general" law of physics and accepted scientific and engineering principles, without identifying the specific laws of science and principles or explaining how these generally accepted principles supported his theory. *Id.* at *3, *4, *5. Much like McLellan, he failed to conduct or cite any tests to support his theory and had not read any publications or studies which would corroborate his findings. *Id.* Citing *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 421 (5th Cir. 1987), the Texas Supreme Court refused to take Walker's "say-so" and found that "Walker's reliance on the 'laws of physics', without more, is an insufficient explanation. Although Walker maintains that the methods and formulas he employed are the ones generally accepted and utilized in the accident reconstruction profession, he does not explain how any of the research or tests he relied on support his conclusion." *Id.* at *5. Because Walker failed to connect between the data he relied on and the opinion offered, the analytical gap rendered his opinion unreliable.

McLellan's testimony likewise is not scientifically based and should not be presented to the jury. It is, at best, mere surmise and speculation. The jury would give undue weight to this testimony coming from an expert when it is not actually science. Thus, his testimony should be excluded and this Motion granted.

344911.1

### III.   PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants BMW of North America, LLC and Bayerische Motoren Werke AG pray that the testimony of Rex B. McLellan be excluded, and for such other and further relief, both at law and in equity, to which Defendants BMW of North America, LLC and Bayerische Motoren Werke AG may show themselves justly entitled.

Respectfully submitted,

J. MICHAEL MYERS
State Bar No. 14760800
Federal Bar No. 15110
Direct Line:   (210) 731-6309
Direct Fax:   (210) 785-2909
E-mail: jmm@ball-weed.com
BALL & WEED, P. C.
Trinity Plaza II, Suite 500
745 East Mulberry
San Antonio, Texas 78212
(210) 731-6300

ATTORNEY FOR DEFENDANTS,
BMW OF NORTH AMERICA, LLC and
BAYERISCHE MOTOREN WERKE AG

### CERTIFICATE OF CONFERENCE

Counsel for defendants has conferred with plaintiffs' counsel in an attempt to resolve this dispute without the necessity of Court intervention. Plaintiffs' counsel opposes this Motion.



J. MICHAEL MYERS

344911.1

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been provided to all known counsel of record as indicated below, on the ⎯⎯⎯ day of January, 2005.

| | |
|---|---|
| Mr. Joe J. Fisher, II<br>PROVOST * UMPHREY LAW FIRM, L.L.P.<br>490 Park Street<br>P.O. Box 4905<br>Beaumont, Texas 77704<br>SBN: 00787471<br>409/835-6000<br>FAX: 409/813-8609<br>ATTORNEY FOR PLAINTIFFS | ☐ Local Courier Service<br>☐ Hand Delivery<br>☐ Facsimile<br>☐ U.S. Mail<br>☐ U.S. Certified Mail<br>☒ Federal Express<br>☐ Other courier service |

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
J. MICHAEL MYERS

12

344911.1