UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

JAN 2 0 2005

Michael N. Milby, Clerk

JESSICA AND KEVIN HAFSTIENN          §
INDIVIDUALLY AND AS NEXT             §
FRIEND OF TAYLOR HAFSTIENN,          §
DECEASED                             §
                                     §
VS.                                  §          NO. H-03-1646
                                     §
BMW OF NORTH AMERICA, L.L.C.         §
AND BAYERISCHE MOTOREN               §
WERKE AG                             §

## DEFENDANTS BMW OF NORTH AMERICA, LLC AND BAYERISCHE MOTOREN WERKE AG'S OPPOSED MOTION TO EXCLUDE EXPERT TESTIMONY OF CLARENCE L. NICODEMUS

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Now come BMW OF NORTH AMERICA LLC and BAYERISCHE MOTOREN WERKE AG (collectively "BMW"), Defendants in the above-styled and numbered cause, and file this their opposed motion to exclude the testimony of Plaintiffs' purported expert, Clarence L. Nicodemus.[1] In support of their motion to strike Nicodemus's testimony, BMW would respectfully show the Court as follows:

## I.    INTRODUCTION

This case arises from a two-car automobile accident that allegedly occurred on September 16, 2000, in The Woodlands, Texas. At that time, Jessica Hafstienn was driving her 1999 BMW 323i with her son Taylor Hafstienn as a passenger. At the intersection of Grogan's Mill Road and Millpark Drive, Jessica Hafstienn failed to yield right-of-way and was violently struck on the side by a Sierra GMC pick-up truck driven by Ross Hardin, who was

---

[1] The Deposition of Dr. Clarence L. Nicodemus, taken on May 4, 2003, is attached as "Exhibit A." The

traveling at an excessive rate of speed. According to the police report, Hardin's pickup was traveling at least 73 miles per hour in a 45 mile per hour zone at the time of the accident. Plaintiffs have sued BMW of North America, LLC and Bayerische Motoren Werke AG under a variety of theories including negligence and products liability. Plaintiffs have designated Clarence Nicodemus to testify regarding causation of Taylor Hafstienn's death. His testimony should be excluded under the *Daubert* standard.

## II.    ARGUMENT AND AUTHORITIES

### A.    <u>Standards Governing Admissibility of Expert Opinions</u>

In *Daubert v. Merrill Dow Pharmaceuticals. Inc.*, 509 U.S. 579 (1993), the United States Supreme Court addressed the principles applicable to determining the admissibility of opinion testimony offered by expert witnesses under the Federal Rule of Evidence 702. *Daubert*, 509 U.S. at 589. Rule 702 allows a qualified expert to testify "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. An expert's testimony must rest both on a reliable foundation and be relevant to the task at hand. *Daubert*, 509 U.S. at 597. If an expert's testimony is not based on reliable scientific knowledge, or if it is based on such knowledge but fails to relate to any material facts, then it is not useful and, therefore, not relevant. The proponent of the evidence bears the burden of establishing its admissibility by a preponderance of the evidence. *Id.* at 593.

The trial court has the obligation and broad discretion to be the "gatekeeper" in determining the reliability and relevance of the proposed evidence. *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 141 (1999). As gatekeeper, the trial court must make certain that an expert, whether basing testimony upon professional studies or personal experience,

---

Deposition of Dr. Clarence L. Nicodemus, taken on October 26, 2004, is attached as "Ex. B."

345095.1

employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Id.* at 152. In fulfilling its obligation as gatekeeper, the trial court must conduct a two-tier analysis of the expert's work. The first tier of the analysis requires an examination of the reliability of the expert testimony, based on: (1) the qualifications of the expert;; and (2) the grounds upon which the expert bases his opinion. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997), *citing Cummins v. Lyle Indus.*, 93 F.3d 362, 367 (7th Cir. 1996). The focus is on whether the reasoning or methodology underlying the testimony is scientifically valid and can be properly applied to the facts in issue. *Daubert*, 509 U.S. at 592-93, 113 S. Ct. at 2796. Rule 702 provides guidelines to aid the trial court in ascertaining the validity of the opinion: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methodology; and (3) the witness has applied the principles and methodology reliably to the facts of the case. FED. R. EVID. 702; *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371-72 (5th Cir. 2000); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 n. 1 (4th Cir. 2001). Other non-exclusive factors include: (1) whether the theory has been/can be tested; (2) whether the theory has been subjected to peer review and publication; (3) the potential or known rate of error; (4) whether the theory has been generally accepted; (5) whether the theory is from litigation or naturally flowed from research; (6) whether other alternative explanations have been ruled out; and (7) whether the proposed expert sufficiently connected the proposed testimony with the facts of the case. *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 686-87 (8th Cir. 2001).

In the second tier of *Daubert* analysis, the trial court must also determine that the testimony "fits" the case before it; that is, the evidence will assist the trier of fact by being relevant to the issues raised in the case. FED. R. EVID. 702; *Daubert*, 509 U.S. at 591-92; 113

3

S. Ct. at 2795-96. As the Fifth Circuit Court of Appeals has explained, "the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument. Indeed, the premise of receiving expert testimony is that it will assist the trier of fact to understand the evidence or to determine a fact in issue." *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1231, 1233 (5th Cir. 1986). The expert must testify to something more than what is obvious to a layperson to be of any assistance to the jury. *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998). Just because a witness is an expert in one field does not mean that the expert may testify in all aspects and specialties of that field. *See Wilson v. Woods*, 163 F.3d 935, 937-38 (5th Cir. 1999) (fire reconstruction and investigation specialist was not allowed to testify regarding automobile reconstruction); *Perkins v. Volkswagen of Am., Inc.*, 596 F.2d 681, 682 (5th Cir. 1979) (mechanical engineer who had no experience designing automobiles was not allowed to testify as an expert on automobile design).

## B.   Nicodemus's Testimony Should Be Excluded

Plaintiffs have retained Clarence L. Nicodemus to testify as to the cause of Taylor Hafstienn's death and to speculate that Taylor would have survived but for the vehicle separation. Nicodemus is not qualified to render these opinions and, in fact, his testimony does nothing more than repeat the report of the medical examiner. He should not be permitted to testify in this matter.

### 1.   Nicodemus is not Qualified to Testify

#### a.   *No Medical Training or Experience*

Although he has since graduated, when Nicodemus first rendered his opinion, he was attending osteopathic school, and was not (and is not) a doctor of medicine licensed in Texas. (Ex. "A" at pp. 4-5; Ex. B at p. 19). He could not prescribe medicine nor conduct surgery at the

4

time of rendering his opinion. (Ex. A. at p. 4). Further, he had never worked as a healthcare professional, and, of course, is not a neurosurgeon. (Ex. A. at pp. 4, 88). At the time of his second deposition in October 2004, he had just entered his first year of residency and still had not worked at a clinic. (Ex. B. at p. 20).

Instead, Dr. Nicodemus is a professional witness with a long history of testifying in litigation. He charges $450.00 per hour. (Ex. A. at p. 12). He has given over 100 depositions and testified at trial six times. (Ex. A. at p. 27). His testimony was given 100% of the time on behalf of plaintiffs. (Ex. A. at p. 30). After graduating from osteopathic school, although he was supposed to devote "all available" hours to his residency, he still had three ongoing cases, two of them with Provost Umphrey. ( Ex. B at pp. 20-21). Nicodemus does not have the medical background to render opinions as to the cause of death in this case.

Furthermore, Nicodemus is not a pathologist and has never worked as a medical examiner. (Ex. A. at pp. 39-40; Ex. B. at p. 22). He has never professionally done an examination to determine the cause of death and has never been responsible for signing a death certificate. (Ex. A. at p. 40; Ex. B. at p. 22). He has never worked for a medical examiner or coroner. (Ex. A. at 80).

### b.   No Automotive or Accident Reconstruction Experience

Nicodemus also has absolutely no experience in automobile dynamics that would allow him to render opinions in this case. He has no degree in the field of automobile engineering. (Ex. A. at p. 44). He has never been an employee of a company involved in the design of automobiles and he has never been engaged in the business of manufacturing or assembling automobiles. (Ex. A. at p. 6; Ex. B at p. 41). He has never presented any papers at a Society of Automotive Engineers ("SAE") Convention nor has he published in any of the

345095.1

SAE publications. (Ex. A. at p. 45). He has not taken any courses in vehicle dynamics and does not have a degree in biomechanical engineering. (Ex. A. at p. 109).

He has never worked in the automotive industry and has never seen any type of automotive testing done to comply with the Federal Motor Vehicle Safety Standards. (Ex. A. at pp. 68, 114-115). He has never designed anything related to an automobile and does not have any patents on automobile components. He is not a metallurgist and he has never published in that area. (Ex. A. at p. 38). He also has not consulted with any companies engaged in the business of designing, manufacturing, or marketing automobiles to come up with his opinion. (Ex. B at p. 32).

Nicodemus had never participated in a crash test or in establishing protocols for a crash test. ( Ex. B at p. 37). He had no knowledge what the FMVSS was or the standard set by the FMVSS. ( Ex. B at p. 38). He had no part in establishing the protocol for the KARCO crash test, performed in June 2004. ( Ex. B at p. 40).

Nicodemus also lacks any experience regarding accident reconstruction. He has never worked for a law enforcement agency and has no certification in accident reconstruction. (Ex. A. at pp. 37-38). He has not authored any papers in the area of accident reconstruction nor taught any courses in accident reconstruction. (Ex. A. at p. 38).

As to the facts of this case, Nicodemus has not conducted an independent examination of the underlying facts of the accident. He has never seen the entire BMW at issue nor the Sierra pick-up involved in this case. (Ex. A. at pp. 45, 47). He has not analyzed the crash involved with the two vehicles. (Ex. A. at p. 46). He did not make any calculations regarding the deformation of the BMW. (Ex. A. at p. 70). He actually did no calculations, measurements or statistical analysis at all in this case, including the G force imposed on Ross Hardin. (Ex. A.

6

at pp. 72-73; Ex. B at pp. 44-45). He has never been to the accident site and had no knowledge of the conditions of the accident. (Ex. A. at p. 79; Ex. B at p. 28). Thus, he has no basis to render opinions as to the causation issues in this accident.

Without any background or training regarding the assessment of cause of death in an automobile collision, Nicodemus cannot qualify as an expert on causation in this case. Just because a witness has experience in a general medical area does not mean that the expert may testify in all aspects and specialties of that field. *See Wilson v. Woods*, 163 F.3d 935, 937-38 (5th Cir. 1999) (fire reconstruction and investigation specialist was not allowed to testify regarding automobile reconstruction); *Perkins v. Volkswagen of Am., Inc.*, 596 F.2d 681, 682 (5th Cir. 1979) (mechanical engineer who had no experience designing automobiles was not allowed to testify as an expert on automobile design). Nicodemus is not qualified to testify, and his testimony should be excluded.

### 2. Dr. Nicodemus is a Paid Professional Witness Who Repeats the Autopsy Findings With No Scientific Basis for Any of His Findings

Nicodemus is a professional witness attempting to regurgitate the findings of the medial examiner and put his own unscientific spin on how the injuries to Taylor Hafstienn occurred. His entire theory is based upon the process of elimination and his examination of the photographs in the autopsy. (Ex. A. at pp. 73-75, 103). He never personally saw Taylor Hafstienn after his death, nor did he talk to anyone involved in the autopsy. (Ex. A. at pp. 57-58). He interprets what the medical examiner has said based upon his examination of the autopsy photographs. (Ex. A. at p. 75). There is nothing other than the photographs to support his theory, and rank speculations drawn from the medical examiner's report. (Ex. A. at p. 85). All Nicodemus does is speculate upon the autopsy photographs.

7

Furthermore, Nicodemus has no scientific basis for any of his conclusions, which is not surprising since he performed absolutely no research to support his theory. ( Ex. B at p. 56). None of the papers cited in his curriculum vitae address the issue of head injuries. (Ex. A. at p. 38). He knows of no publications or peer-reviewed articles that support his opinions or conclusions in this case. (Ex. A. at pp. 35-36). He admits that there are simply no materials that support his opinions in this case. (Ex. A. at p. 37). He does not cite any sources in his report. (Ex. A. at p. 106). He has performed no calculations at all of the forces and factors involved in the underlying accident, including the G forces on Taylor Hafstienn, the rotational direction of the BMW or the distance the BMW with its occupants traveled after impact, and did not attempt to perform any simulations of the accident. (Ex. B at pp. 44-45, 55, 58, 60). He cannot cite to any publication supporting his conclusions and admitted that none exists. (Ex. B at pp. 51, 68). His theory has absolutely no support in literature or any objective scientific principle, and his attempt to rely on his "experience" is unreliable, since he has no experience assessing injuries to the head arising from an accident similar to one at issue.

Put simply, Nicodemus did not even attempt to do any statistical analysis of the probability of death in this case. (Ex. A. at p. 57). There are no peer-reviewed materials upon which he relies. (Ex. A. at p. 86). He has not published anything in peer-reviewed literature regarding the severity of impact to the head. (Ex. A. at p. 89). His analysis does not have an associated rate of error. (Ex. A. at p. 100). Nicodemus's opinion is pure speculation and surmise and should not be admitted before the jury. *See, e.g., Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1115-16 (5th Cir. 1991) (overruled on other grounds by *Daubert*) (doctor's "scientific hunch" which is unexplained or unsupported by any methodology that witness utilized to reach his opinion is not admissible); *see also,*

8

*Seatrax, Inc.*, 200 F.3d at 372 (failure or appraisal expert to conduct independent analysis of valuation figures was one of the "insurmountable obstacles" in party's attempt to qualify him as an expert); *Boyd v. State Farm Ins. Co.*, 158 F.3d 326, 331 (5th Cir. 1998) (without more than an his credential and subjective opinion, an expert's testimony which lacks the materials or data that the opinion is based upon as well as the reasoning process underlying that opinion is inadmissible).

In an opinion issued on December 31, 2004, the Texas Supreme Court found that the jury would not be assisted by the unreliable opinion of an expert who failed to conduct tests, cite studies, or perform calculations in support of his theory, which was not peer-reviewed. *Volkswagen of Am., Inc. v. Ramirez*, ___ S.W.3d ___, 2004 WL 3019227 at *3 - *5 (Tex. 2004). In *Ramirez*, plaintiffs alleged that a bearing defect in the left rear wheel of the Volkswagen Passat driven by Haley Sterling caused her to crash into a second vehicle, a mustang, oncoming from the opposite direction of the Passat. *Id.* at *3. According to plaintiffs, the left rear wheel of the vehicle detached yet stayed tucked in as Sterling lost control of the Passat, which crossed the concrete median. *Id.* The issue was whether the damage to the wheel had occurred before or after the crash. *Id.*

Ronald Walker, plaintiff's accident reconstructionist, theorized that the accident occurred because of a defect in the vehicle rather than driver error. *Ramirez*, ___ S.W.3d ____, 2004 WL 3019227 at *3. According to Walker, the wheel of the Passat detached before the crash but was able to stay in the rear wheel well as the Passat traversed over the median, collided with the mustang, and partially spun. *Id.* To explain his conclusion, Walker cited to the "general" law of physics and accepted scientific and engineering principles, without identifying the specific laws of science and principles or explaining how these generally accepted

principles supported his theory. *Id.* at \*3-\*4, \*5. Much like Nicodemus, he failed to conduct or cite any tests to support his theory and had not read any publications or studies which would corroborate his findings. *Id.* Citing *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 421 (5th Cir. 1987), the Texas Supreme Court refused to take Walker's "say-so" and found that "Walker's reliance on the 'laws of physics', without more, is an insufficient explanation. Although Walker maintains that the methods and formulas he employed are the ones generally accepted and utilized in the accident reconstruction profession, he does not explain how any of the research or tests he relied on support his conclusion." *Id.* at \*5. Because Walker failed to connect between the data he relied on and the opinion offered, the analytical gap rendered his opinion unreliable.

Nicodemus regurgitates others' opinions without having conducted any investigation or study of the facts of the case. Furthermore, a majority of his opinions are derived from the unreliable conclusions of Thomas Grubbs, Plaintiffs' purported accident reconstructionist. In *Ramirez*, the Texas Supreme Court found that the opinion of plaintiffs' causation witness, Edward Cox, was no evidence of causation, because it was based upon Walker's unreliable opinion regarding the cause of the crash. *Id.* at \*10-11. Further, this Court has found that when the facts that an expert grounds his opinion upon are themselves unreliable, the expert's opinion lacks any basis in fact and should be excluded. *El Aguila Food Prods., Inc. v. Gruma Corp.*, 301 F.Supp.2d 612, 623-24 (S.D. Tex. 2003) ("Reliability means that the expert opinion is based on and supported by what is real and known. The testimony that is relied upon to support Dr. Gundlach's assumptions are the self-serving testimony of plaintiffs, which fails to establish a basis for their claim of loss sales.").

Nicodemus's testimony will not be helpful to the jury, because he is not qualified to render an opinion, his opinions are not based on reliable facts, and his methodology has not been approved or accepted by the general scientific community. For all of these reasons, BMW's motion to exclude his testimony should be granted.

### III.   PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants BMW OF NORTH AMERICA, LLC and BAYERISCHE MOTOREN WERKE AG pray that the testimony of Clarence L. Nicodemus be excluded, and for such other and further relief, both at law and in equity, to which Defendants BMW of North America, LLC and Bayerische Motoren Werke AG may show themselves justly entitled.

Respectfully submitted,

J. MICHAEL MYERS
State Bar No. 14760800
Federal Bar No. 15110
Direct Line:   (210) 731-6309
Direct Fax:   (210) 785-2909
E-mail: jmm@ball-weed.com
BALL & WEED, P. C.
Trinity Plaza II, Suite 500
745 East Mulberry
San Antonio, Texas 78212
(210) 731-6300

ATTORNEY FOR DEFENDANTS,
BMW OF NORTH AMERICA, LLC and
BAYERISCHE MOTOREN WERKE AG

11

345095.1

## CERTIFICATE OF CONFERENCE

Counsel for Defendants has conferred with Plaintiffs' counsel in an attempt to resolve this dispute without the necessity of Court intervention. Plaintiffs' counsel opposes this Motion.

J. MICHAEL MYERS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been provided to all known counsel of record as indicated below, on the $15^F$ day of January, 2005.

Mr. Joe J. Fisher, II
PROVOST * UMPHREY LAW FIRM, L.L.P.
490 Park Street
P.O. Box 4905
Beaumont, Texas 77704
SBN: 00787471
409/835-6000
FAX: 409/813-8609
ATTORNEY FOR PLAINTIFFS

☐ Local Courier Service
☐ Hand Delivery
☐ Facsimile
☐ U.S. Mail
☐ U.S. Certified Mail
☒ Federal Express
☐ Other courier service

J. MICHAEL MYERS

345095.1

TAB A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

JESSICA AND KEVIN HAFSTIENN          *
INDIVIDUALLY AND AS NEXT             *
FRIEND OF TAYLOR HAFSTIENN,          *
DECEASED                             *
                                     *
VS.                                  *       NO. G-02-143
                                     *
BMW OF NORTH AMERICA, L.L.C.         *
AND BAYERISCHE MOTOREN               *
WERKE AG                             *

ORAL DEPOSITION OF


DR. CLARENCE L. NICODEMUS

MAY 4, 2003


         ORAL DEPOSITION OF DR. CLARENCE L. NICODEMUS, produced as

a witness duly sworn by me at the instance of the Defendant,

taken in the above-styled and numbered cause on MAY 4, 2003

before STACY AMY BAKLIK, CSR, RPR, Certified Shorthand Reporter

No. 2680 in and for the State of Texas, at the offices of

Provost Umphrey, Beaumont, Texas, pursuant to the Federal Rules

of Civil Procedure and the provisions stated on the record or

attached therein.


                    *   *   *   *   *

EXHIBIT

A

**Page 2**

```
 1                    APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4       MR. ED FISHER
         Provost Umphrey
 5       490 Park Street
         Beaumont, Texas 77701
 6
 7   FOR THE DEFENDANT:
 8
 9       MR. J. MICHAEL MYERS
         Ball & Weed
10       Trinity Plaza II,  Suite 500
         745 East Mulberry
11       San Antonio, Texas 78212
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                I N D E X
 2
 3                              PAGE
 4   Appearances ............................. 2
 5   Stipulations ............................ 4
 6
 7   DR. CLARENCE L. NICODEMUS
 8       Examination by Mr. Myers        4
 9
10
11
12               EXHIBITS
13
14   NUMBER                   PAGE MARKED
15   1-22                        4
16   23                         107
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1        THE COURT REPORTER:  What are the agreements?
 2        MR. MYERS:  Pursuant to the Federal Rules.
 3        MR. FISHER:  That's fine.  He'll read and sign.
 4        (AT THIS TIME, DOCUMENTS WERE MARKED FOR
 5   IDENTIFICATION PURPOSES AS DEFENDANT'S EXHIBITS NOS. 1 THROUGH
 6   22.  SAME WILL BE BOUND IN SEPARATE EXHIBIT VOLUMES.)
 7            DR. CLARENCE L. NICODEMUS,
 8   having been first duly sworn to testify the truth, the whole
 9   truth, and nothing but the truth, testified as follows:
10             (11:45)
11            EXAMINATION
12   BY MR. MYERS:
13     Q.  Please state your full name.
14     A.  Clarence L. Nicodemus.
15     Q.  And Dr. Nicodemus, where do you live?
16     A.  East Lansing, Michigan.
17     Q.  You do not live in the State of Texas?
18     A.  I do not.
19     Q.  What do you do in East Lansing, Michigan?
20     A.  Currently I'm attending medical school.
21     Q.  And which medical school are you attending?
22     A.  Michigan State College of Osteopathic Medicine.
23     Q.  And do you have a projected time when you expect to
24   receive your doctor of osteopathy?
25     A.  Yes, May 6, 2004.
```

**Page 5**

```
 1     Q.  When did you begin your studies at Michigan State?
 2     A.  In September, 2000.
 3     Q.  So, you are not a medical doctor?
 4     A.  I am not.
 5     Q.  When you receive your degree, you will not be an
 6   M.D.?
 7     A.  No, I'll be a D.O.
 8     Q.  So, you will not have - be able to put the letters
 9   "M.D." behind your name when you graduate?
10     A.  No.  I have the same rights, privileges.
11        MR. MYERS:  Objection, nonresponsive.
12     Q.  (By Mr. Myers)  My question right now is you will not
13   have "M.D." behind your name?
14     A.  Correct.
15     Q.  Right now you cannot prescribe medicine?
16     A.  No.
17     Q.  You cannot conduct surgery?
18     A.  Correct.
19     Q.  Okay.  You've never worked as a health-care
20   professional?
21     A.  No.
22     Q.  Let me get a little bit more background from you.
23   Have you served in any branch of the United States military?
24     A.  Yes.
25     Q.  Which one?
```

Case 4:03-cv-01646   Document 108   Filed in TXSD on 01/20/05   Page 16 of 38

**Page 6**

1    A. Army.
2    Q. When?
3    A. My commission was in 1965, June of 1965; and I
4 resigned my commission in - I think it was, like, August of
5 '72.
6    Q. What were you generally doing while you were in the
7 U.S. Army?
8    A. My primary assignment was with the air defense
9 artillery as an officer, commanding officer, and did a hitch in
10 Vietnam in intelligence, a branch independent assignment, and
11 then returned to air defense as an instructor at Fort Bliss.
12    Q. You were not doing accident investigations or
13 reconstructions while you were in the Army?
14    A. No.
15    Q. You have never been a full-time employee of a company
16 who was engaged in the business of designing automobiles?
17    A. No.
18    Q. You have never been a full-time employee of a company
19 who was engaged in the business of manufacturing or assembling
20 automobiles?
21    A. No.
22    Q. In regard to this particular case, we have marked
23 before the court reporter arrived certain exhibits as
24 Defendant's exhibits, and you and I have gone through and
25 marked as Exhibits 1 through 22 those exhibits that are in your

**Page 7**

1 file that are documents that you either relied in whole or in
2 part on in arriving at the opinions and conclusions that you
3 intend to express at the trial of this case, correct?
4    A. Yes.
5    Q. And we have also - you've brought other documents
6 with you that we did not mark because you indicated, I believe,
7 off the record that you had not relied upon these documents in
8 arriving at your opinion and conclusions, correct?
9    A. That's correct.
10    Q. And in order to just expedite what we have as your
11 file, then - and we'll go through 1 through 22 later on - but
12 we have - you brought with you the deposition of Winfried
13 Kleges, the BMW title history and some BMW documents. You did
14 not rely upon those?
15    A. That's correct.
16    Q. There were some more BMW documents that are attached
17 to a letter dated April 28, 2003. You did not rely upon those?
18    A. Correct.
19    Q. Okay. You also brought a letter dated April 24,
20 2003, directed to you and others from Ed Fisher regarding
21 invoices on an outstanding expenses. You did not rely upon
22 that?
23    A. That's correct.
24    Q. There was a letter dated April 24, 2003, which has
25 three categories of BMW documents. You did not rely upon those

**Page 8**

1 documents?
2    A. Correct.
3    Q. There is a letter from me dated April 23, 2003, to Ed
4 Fisher enclosing some additional BMW documents. You did not
5 rely upon that?
6    A. That's correct.
7    Q. Here is another letter from me dated April 10, 2003,
8 to Ed Fisher also enclosing other BMW documents. You did not
9 rely upon those?
10    A. Correct.
11    Q. There is a letter dated April 22, 2003 regarding
12 expert reports. You didn't rely upon that?
13    A. Correct.
14    Q. There is a memo dated April 22, 2003, regarding
15 expert report deadlines. You did not rely upon that?
16    A. Correct.
17    Q. Likewise, there is an April 14, 2003 memorandum from
18 Provost Umphrey with an attached April 14, 2003 letter to you
19 scheduling your deposition. You didn't rely upon that?
20    A. Correct.
21    Q. There is a memo dated April 9, 2003 from Mike Monk to
22 Ed Fisher. You didn't rely upon that?
23    A. Correct.
24    Q. There is an April 8, 2003 memo regarding scheduling
25 your deposition. You didn't rely upon that?

**Page 9**

1    A. Except to arrange to be here.
2    Q. Okay. And March 24, 2003, got a memo likewise
3 scheduling your deposition. That's not something you relied
4 upon regaring your opinions and conclusions?
5    A. Correct.
6    Q. There is a March 19, 2003 memo regarding a joint
7 inspection between you or with you and others the vehicle. You
8 didn't rely upon that in forming your opinions?
9    A. Correct.
10    Q. Likewise, there is a March 19, 2003 memo requesting a
11 deposition and trial history for you. You didn't rely upon
12 that?
13    A. Correct.
14    Q. I think we figured out that the Texas Department of
15 Public Safety criminal investigation of dated March 18, 2003,
16 there was a duplicate?
17    A. Yes.
18    Q. There is a March 17, 2003 memo again regarding
19 depositions and inspections. You didn't rely upon that with
20 regard to your conclusions?
21    A. Correct.
22    Q. There is a copy of the Plaintiff's Complaint, First
23 Amended Complaint. You didn't rely upon that?
24    A. Correct.
25    Q. There is a March 11, 2003 letter regarding deposition

**Page 10**

1 scheduling. You didn't rely upon that?
2    A. Correct.
3    Q. Same thing is true about a March 11, 2003 letter
4 regarding the inspection, joint inspection. You didn't rely on
5 that?
6    A. Correct.
7    Q. There is a March 11, 2003 memo with a March 11, 2003
8 letter to Mr. Rosenbluth asking about deposition dates. You
9 didn't rely upon that?
10    A. Correct.
11    Q. There is an autopsy report for Taylor Hafstienn, and
12 I believe we figured that that was a duplicate.
13    A. Yes.
14    Q. There is a February 10, 2003 conference call memo.
15 You didn't rely upon that?
16    A. Correct.
17    Q. There is a First Amended Complaint. You didn't rely
18 upon that?
19    A. Correct.
20    Q. There is some medical and billing records pertaining
21 to Taylor Hafstienn. I think you glanced at those off the
22 record and told us you didn't rely upon those, either.
23    A. They are duplicates.
24    Q. Okay. So, what we have here, the documents I just
25 described as well as Exhibits 1 through 22, contain all of the

**Page 11**

1 documents in your file with the exception of some photographs
2 that I understand that you did not bring today.
3    A. That's correct.
4    Q. When we have those photographs - which you are going
5 to supply to us, are you not?
6    A. Yes.
7    Q. When we have those photographs and we have the
8 documents that are seated here on the table, those we've marked
9 as Exhibits 1 through 22 as well as the ones that I just went
10 through, do we have all documents which ever have been and are
11 now a part of your file in this case?
12    A. Yes.
13    Q. There are no documents that have been removed?
14    A. No.
15    Q. In regard to the documents you brought with you
16 today, one of the documents, Exhibit No. 1, is your report,
17 correct?
18    A. Yes.
19    Q. Okay. And is that the only report that you've ever
20 prepared in this case?
21    A. Yes.
22    Q. You've never supplemented this report?
23    A. No, I have not.
24    Q. Okay. The report is dated April 25, 2003.
25    A. Correct.

**Page 12**

1    Q. It is directed to Ed Fisher at the Provost Umphrey
2 law firm.
3    A. Correct.
4    Q. Second item is the Defendant's Exhibit No. 2. This
5 is billing records, is it not?
6    A. Yes.
7    Q. Okay. And how much are you billing the Provost
8 Umphrey firm in Exhibit No. 2?
9    A. A Total of $4,590.
10    Q. Did you charge Provost Umphrey law firm a $5,000
11 retainer in this case?
12    A. Yes.
13    Q. And as I understand it, your current hourly rate is
14 $450 per hour.
15    A. Yes.
16    Q. With a four-hour minimum?
17    A. Correct.
18    Q. So, in other words, if you show up at trial and just
19 testified for 30 minutes, you would still be charging four
20 hours of time at $450 an hour?
21    A. That's correct.
22    Q. Which would be $1,800?
23    A. Correct.
24    Q. Likewise, if we went a full day here today, you would
25 be charging $450 per hour for the entire time?

**Page 13**

1    A. Yes.
2    Q. When you get on an airplane and go back to Michigan
3 today, will you be charging as you fly through the air $450 per
4 hour to the Provost Umphrey law firm?
5    A. Yes.
6    Q. And from the time that you began your retention in
7 this case, you have at all times charged the Provost Umphrey
8 law firm $450 per hour for your time?
9    A. Correct.
10    Q. Let me show you Exhibit 3. This appears to be
11 another invoice in the total amount of $14,714.
12    A. Correct.
13    Q. And Exhibit 5 appears to be another invoice from you
14 to the Provost Umphrey law firm in the amount of $21,894.
15    A. That's correct.
16    Q. Are those all of the billing that you have done in
17 this case to date?
18    A. Yes.
19    Q. Do you have any unbilled time?
20    A. No.
21    Q. Have you billed for today?
22    A. Yes, that's included.
23    Q. That's what I thought. Okay. Do you have any
24 expectations at least as you sit here right now of doing any
25 additional work in this case?

Case 4:03-cv-01646   Document 108   Filed in TXSD on 01/20/05   Page 18 of 38

Page 14

1    A. No.
2    Q. Have you done everything that you intend to do or
3 feel like you need to do before going to the courthouse to
4 testify?
5    A. Yes.
6    Q. And when the jury sees you on the witness stand, they
7 will see you charging Provost Umphrey at a rate of $450 per
8 hour?
9    A. Correct.
10    Q. Let's look at - well, why don't you look at these
11 Exhibits, 2, 3 and 5, and just tell us approximately what the
12 total amount of billing is that you have generated in this case
13 to date.
14    A. Well, if you add them up - you want an exact total?
15    Q. As exact as you can make.
16    A. Well, if anybody has an adding machine, we can do it.
17    Q. Well, I don't have one here.  But if you can just
18 give me an approximation, that will be fine for our purposes
19 today.
20    A. Well, 21 and 14 is 35 and approximately 5.  So, about
21 $40,000.
22    Q. Now, if you were asked to come to the Galveston
23 Federal Court to testify in this case - and I presume you have
24 been asked to do that.
25    A. Yes.

Page 15

1    Q. Okay.  And you fully expect to be available and come
2 down and testify?
3    A. Correct.
4    Q. Will you do any more preparation work?
5    A. I will prepare for the testimony by reviewing.
6    Q. And then you will also expect the Provost Umphrey law
7 firm to pick up any travel expenses, airfare, meals, hotel
8 rooms and the like for you?
9    A. Correct.
10    Q. In looking at Exhibit 4, is this a list of your
11 testifying history?
12    A. Yes.
13    Q. Okay.  And it goes back it appears to 1997?
14    A. Yes, I think so.
15    Q. But you were in the testifying business before 1997,
16 were you not?
17    A. For 15 years, roughly.
18    Q. So, this isn't going to tell us every lawsuit that
19 you've testified in either by deposition or by trial?
20    A. That's correct.
21    Q. I see here under - it says testimony, and there is B,
22 D, T, R.  Can you tell me what that legend - what those letters
23 are supposed to indicate?
24    A. D is depositions.  T is trial.  B is both trial and
25 deposition.  R, I think, is a report.

Page 16

1    Q. Okay.  Now, in these cases, it appears that you
2 have - there was a case called Cannon versus General Motors.
3    A. I guess.  I can't remember all that's on there.
4    Q. Well, it says that it was pending here in Jefferson
5 County in Beaumont, Texas.  Does that refresh your recollection
6 at all?
7    A. When was that?
8    Q. Says 1997.
9    A. That's almost six years ago.  I don't recall it.
10    Q. In any event, you were not testifying on behalf of
11 General Motors in that case?
12    A. Correct.
13    Q. Okay.  Were you hired by some plaintiff law firm who
14 was suing General Motors seeking money damages?
15    A. Yes.
16    Q. You can't tell us whether or not the law firm that
17 hired you in that case was the Provost Umphrey firm or not?
18    A. No, I can, because I believe there is another
19 attorney here that I worked for during that period.  It could
20 have been.  I don't know for sure.
21    Q. What other attorney here in Beaumont did you work
22 for?
23    A. I knew you were going to ask me that, and I can't
24 remember his name.
25    Q. Was he a fellow that was representing plaintiffs in

Page 17

1 personal injury lawsuits?
2    A. Yes, plaintiffs.
3    Q. Let's just go through a few more of these cases,
4 there is a case, Babineaux versus General Motors, that case
5 likewise pended here in Jefferson County, Beaumont, Texas.  Can
6 you tell us whether or not you were hired by the Provost
7 Umphrey firm in that case?
8    A. That was Provost Umphrey, yes.
9    Q. And that case, I presume you were hired by the
10 plaintiffs to testify against General Motors.
11    A. Correct.
12    Q. What kind of a General Motors vehicle was involved in
13 that case?
14    A. I believe it was a pickup, if I'm not mistaken.
15    Q. Was it a side impact case?
16    A. Not fully side.  It was 10:00 o'clock, 11:00 o'clock,
17 as I recall.
18    Q. Was it a situation where one vehicle had been torn in
19 half?
20    A. No.
21    Q. Are any of the cases that we see here listed on
22 Exhibit 4 a case - to the extent they involved vehicular
23 accidents - a case where the vehicle was ripped in half in a
24 side impact?
25    A. No.

Page 18

1   Q. Have you ever testified either by deposition or at
2 trial in any other case in which there was a side impact
3 between two vehicles and one of the vehicles was ripped in
4 half?
5   A. Not that I recall.
6   Q. There is a case, Grose versus Nissan Motor Corp. that
7 pended in 1997 in St. Louis. I presume you were hired by the
8 plaintiffs who were suing Nissan.
9   A. Correct.
10   Q. How many times have you testified against Nissan?
11   A. Over the entire time, I don't know, maybe five or six
12 times. I really don't recall.
13   Q. You've never been hired by Nissan?
14   A. No.
15   Q. How many times would you estimate that you have
16 testified against General Motors?
17   A. More than Nissan, unknown amount.
18   Q. So, more than six times?
19   A. Yes.
20   Q. Less than 20?
21   A. Probably.
22   Q. Well, looking here there seems to be several other
23 cases. There is an Odom versus GMC case that was again pending
24 down here in Jefferson County. Do you remember what type of a
25 vehicle was involved in that case?

Page 19

1   A. I don't recall Odom.
2   Q. Let me ask you this. Was that another case where you
3 were hired by the Provost Umphrey lawsuit firm?
4   A. Could I see that?
5   Q. Sure.
6   A. I think this was part of the same case, part of the
7 Babineaux case. It was another occupant at a later time, that
8 was.
9   Q. I'm sorry?
10   A. Yes, that was Provost Umphrey.
11   Q. Okay. So, at least we've got on this list so far
12 Babineaux versus General Motors and Odom versus General Motors
13 as two cases in which you were hired by the Provost Umphrey law
14 firm and were testifying against General Motors Corporation?
15   A. Correct.
16   Q. There is a case here Elizondo versus Chrysler. Were
17 you hired by the plaintiffs who were seeking money damages
18 against Chrysler in that case?
19   A. Yes.
20   Q. There is a case, Ritter versus General Motors. Is
21 that another Provost Umphrey case?
22   A. I don't recall Ritter.
23   Q. Jefferson County, Texas and it's the year 2000.
24   A. I just don't recall the case.
25   Q. Okay. But you would not have been testifying on

Page 20

1 behalf of General Motors?
2   A. Correct.
3   Q. You would have been hired by the plaintiffs?
4   A. Yes.
5   Q. There is Sepulvado versus Chrysler pending in Harris
6 County which would have been Houston. Do you know - I presume
7 you were testifying against Chrysler.
8   A. Yes.
9   Q. On behalf of plaintiffs who were suing them?
10   A. Correct.
11   Q. Who hired you there?
12   A. I don't know. I cannot remember.
13   Q. There is Ramirez versus Mazda which pended in San
14 Antonio. I presume you were testifying against Mazda.
15   A. Yes. I don't remember the case.
16   Q. So, you can't tell us who hired you?
17   A. No, I cannot.
18   Q. There is DePastena versus Mazda, pended in
19 Tuscaloosa, Alabama. I presume you were testifying against
20 Mazda on behalf of the plaintiffs who were seeking money
21 damages.
22   A. Yes.
23   Q. Do you remember who hired you there?
24   A. Alabama?
25   Q. Yes.

Page 21

1   A. No.
2   Q. There is a case, Garland versus BMW which pended in
3 Houston. You were hired to - certainly weren't consulting with
4 BMW?
5   A. No.
6   Q. You've never consulted with BMW for any purpose?
7   A. No, correct.
8   Q. That case involved seat seatbelts and air bags.
9   A. Yes.
10   Q. And you were testifying on behalf of plaintiffs who
11 were suing BMW of North America?
12   A. Correct.
13   Q. There is a case of Burt versus Bridgestone
14 Firestone. Was there any other defendant in that case that was
15 an automobile manufacturer?
16   A. Not at that time.
17   Q. Okay. So, were you testifying - what were you
18 testifying in regard to the Burt versus Bridgestone Firestone
19 case?
20   A. Had to do with use or not use of seatbelt in rear, in
21 the rear seat, and injuries as a result of rollover.
22   Q. And I presume you were testifying on behalf of
23 plaintiffs who were suing Bridgestone Firestone for money
24 damages.
25   A. Correct.

| Page 22 |
|---|
| 1    Q. You've got some other cases here, Berger versus |
| 2 Halcomb, for example. Did that - what kind of case was that? |
| 3    A. I don't know. Where was it? |
| 4    Q. It was pending in Nueces County which is Corpus |
| 5 Christi. |
| 6    A. I think that was - I think it was a low impact |
| 7 accident between two individuals. |
| 8    Q. There is a case, Hooper versus Suzuki Motor Company. |
| 9 Were you testifying against Suzuki on behalf of plaintiffs |
| 10 suing them for money damages? |
| 11    A. Yes. |
| 12    Q. Do you remember what law firm hired you there? |
| 13    A. Where was that again? |
| 14    Q. That case pended in Center, Texas. So, federal court |
| 15 in the Eastern District of Texas. |
| 16    A. I don't recall. |
| 17    Q. All right. There is a case, Klemptner versus |
| 18 Curtright. What was that about? |
| 19    A. Where was that? |
| 20    Q. San Antonio. |
| 21    A. I don't recall. |
| 22    Q. There was a case, Wendy Lebouef, in Beaumont. |
| 23    A. I think that was - I think that was a Provost Umphrey |
| 24 case. |
| 25    Q. Do you remember who they were suing? |

| Page 23 |
|---|
| 1    A. I do not recall. |
| 2    Q. Brennen versus A-1 Towing in Philadelphia, 1999. Can |
| 3 you tell me what kind of case that involved? |
| 4    A. That was another - it was a rear-end accident, as I |
| 5 recall. |
| 6    Q. Was there an automobile manufacturer involved in that |
| 7 litigation? |
| 8    A. No. |
| 9    Q. Fritz versus DeVille, Sr., pended in Baton Rouge. |
| 10 What kind of product was involved in that, if any? |
| 11    A. Fritz? |
| 12    Q. F-r-i-t-z. |
| 13    A. I don't recall the case. |
| 14    Q. Nolin versus A-1 Rent All, Inc., federal court, Tyler |
| 15 Texas. The firm that hired you was in Beaumont. Was that |
| 16 Provost Umphrey? |
| 17    A. What was the name of the case again? |
| 18    Q. It was Nolin versus A-1 Rent All, Inc. |
| 19    A. I don't recall the case. |
| 20    Q. Okay. Vick versus CPL, Inc., ring any bells with |
| 21 you? |
| 22    A. I don't recall. |
| 23    Q. Zavala versus Wesner, case was in San Antonio. You |
| 24 were hired by a San Antonio firm. |
| 25    A. Zavala? No, I don't recall. |

| Page 24 |
|---|
| 1    Q. Gunn versus Robertson out of Baton Rouge, year 2000? |
| 2    A. That was - that was, again, a low speed impact. |
| 3 There was not a manufacturer involved in that. |
| 4    Q. Were you hired by the plaintiffs? |
| 5    A. I believe so, yes. |
| 6    Q. Hebert versus Frasier pended here in Beaumont. Were |
| 7 you hired by the Provost Umphrey firm in that case? |
| 8    A. I don't recall that case. |
| 9    Q. Standsbury versus Brown, also pended here in |
| 10 Beaumont. |
| 11    A. I don't recall that case. |
| 12    Q. Okay. Ayers versus Outdoor Products, pended in |
| 13 Austin, Texas. |
| 14    A. I do not recall. |
| 15    Q. Stauber versus Kaufman, pended in San Antonio. Can |
| 16 you tell me anything about that? |
| 17    A. Cannot. |
| 18    Q. Haas versus Allen, can you tell me anything about |
| 19 that case - 2001 case in Gladwin, Michigan? |
| 20    A. That was in Michigan case. That was a vehicle impact |
| 21 as well between two individuals. |
| 22    Q. And you were hired by the plaintiff in that case? |
| 23    A. Yes. |
| 24    Q. Holder versus Ransom Industries, case pending in |
| 25 Tyler, Texas, but the law firm that hired you was Beaumont. |

| Page 25 |
|---|
| 1 Was that another Provost Umphrey case? |
| 2    A. That may have been, yes. |
| 3    Q. And what kind of a case was that? |
| 4    A. What was the style again? |
| 5    Q. Holder versus Ransom Industries. |
| 6    A. I think that was an industrial accident, accidental |
| 7 death. |
| 8    Q. What kind of industrial accident? |
| 9    A. If it's the one I'm thinking of - and it's possible |
| 10 it's not - but if it is, it's an individual was caught in a |
| 11 conveyor belt and crushed. |
| 12    Q. On your list which only goes back to 1997, |
| 13 approximately eight of the cases listed on the list are where |
| 14 you were hired by a law firm in Beaumont. |
| 15    A. Yes. |
| 16    Q. And the only firms that have hired you in Beaumont |
| 17 are either the Provost Umphrey firm or this other fellow that |
| 18 was hiring you back in 1997? |
| 19    A. Correct. |
| 20    Q. Does Exhibit 4 here tell us or identify for us all of |
| 21 the cases in which you've work for Provost Umphrey over the |
| 22 years? |
| 23    A. Probably not. There are probably a few prior to |
| 24 that. |
| 25    Q. When you say a few, how many? |

Page 26

1    A. I don't know. You know, it would just be a wild
2 guess if I were to guess, and I don't know. You can see my
3 memory is not too great on recalling cases past yesterday.
4    Q. Well, let me ask you this. In regard to the Provost
5 Umphrey firm, approximately when was the first time you were
6 ever hired by them in any case, how many years ago?
7    A. Could have been 13, 14 years ago, as I recall.
8    Q. And since that time, approximately how many cases
9 have you worked with that firm?
10    A. It would just be a wild guess. I don't have any data
11 points to go by.
12    Q. Would you say it's as many as ten cases?
13    A. I don't think so. I'm surprised that there were as
14 many as eight. I was surprised that there would be ten cases
15 overall. So, my guess would be five or less prior to that.
16    Q. Including this case or not including this case?
17    A. Not including this case.
18    Q. So, this would be approximately, based upon your best
19 recollection right now, the sixth case in which you've worked
20 with the Provost Umphrey firm?
21    A. Yeah, totally. If we include some of what is on
22 there and what I'm estimating in the past, I would say ten or
23 less.
24    Q. So, it could be as many as ten or less, not including
25 the case we are here today on?

Page 27

1    A. Correct.
2    Q. Do you have any other pending matters with the
3 Provost Umphrey firm?
4    A. There is one case working with Mr. Mark Sparks.
5    Q. Is it on the list here that we see as Exhibit 4?
6    A. No. It hasn't come to deposition or trial or report.
7    Q. Do you know if you've been designated as an expert in
8 that case?
9    A. I probably have.
10    Q. What kind of case is it?
11    A. Vehicular. I believe it's - I'm getting cases mixed
12 up, but I think this is where an individual crossed over
13 without headlights and it was a head-on type collision.
14    Q. And you are charging the Provost Umphrey firm $450
15 per hour on that case, too?
16    A. Yes.
17    Q. How many depositions have you given over the years?
18    A. Well, 15 years, you know, probably on average less
19 than ten a year. So, I would say, you know, probably a
20 hundred, roughly.
21    Q. And how many times have you - would you estimate that
22 you have testified at trial?
23    A. Oh, half a dozen.
24    Q. When is the last time you testified at trial?
25    A. It was a case in Dallas. I'd have to look at the --

Page 28

1    Q. I don't see a case in Dallas. Is it on that list?
2    A. Should be.
3    Q. Maybe I just didn't see it.
4    A. I don't see Dallas on here, either, but it should
5 be, was roughly, approximately, two years ago, as I recall.
6 Should be on this list. I don't know why it's not.
7    Q. Were you hired by the plaintiff in that case?
8    A. Yes.
9    Q. And who were they suing?
10    A. Let me think about the case a minute, see if I can
11 dredge that up. Oh, yes. It was a motorcycle helmet case,
12 and it is not on here. Kosokowski was the name.
13    Q. And who was the motorcycle helmet manufacturer that
14 you were testifying against?
15    A. I don't recall.
16    Q. Aside from that one omission, are there any other
17 cases in which you have either testified by trial or at trial
18 or by deposition since 1997 that are not listed on Exhibit 4 as
19 you sit here today?
20    A. Not that I recall.
21    Q. All right. Is there any case on this list, Exhibit
22 4, where you were testifying on behalf of a defendant?
23    A. The one case, State of Florida versus Cardenas. That
24 was in 1999.
25    Q. What kind of case was that?

Page 29

1    A. It was a boat accident case.
2    Q. The State was charging Mr. Cardenas with some sort of
3 misconduct?
4    A. Yes.
5    Q. And was he charged with a crime?
6    A. Yes.
7    Q. And you were defending him or representing him or
8 testifying for him?
9    A. Yes.
10    Q. Well, let's talk about civil cases. Is there one
11 civil case that you can identify for me on that Exhibit 4 where
12 you testified on behalf of a defendant, either by deposition or
13 trial?
14    A. Doesn't look like it. I think some time prior there
15 were a couple of cases involving car-truck interactions, and I
16 testified on behalf of the defendant, a truck company, in that
17 regard.
18    Q. Well, in looking at the cases that are at least
19 listed on Exhibit 4 which go back to 1997, some six or so
20 years, there is not one case that you can identify for me
21 that's a civil case where you testified on behalf of the
22 defendant?
23    A. Correct.
24    Q. Likewise, 100 percent of the cases that involve a
25 defendant as a defendant in the civil cases, you were

## Page 30

1 testifying on behalf - 100 percent of the time you were
2 testifying on behalf of the plaintiff?
3   A. Correct.
4   Q. Okay. You said that there were ten or so other cases
5 in which you were hired by the Provost Umphrey law firm as a
6 testifying witness. How many of those cases involved Thomas
7 Grubbs?
8   A. I don't know exactly, could be - could be as many as
9 half, I guess.
10   Q. So, approximately five cases?
11   A. That I recall.
12   Q. How many of the ten or so cases that you have been
13 hired by the Provost Umphrey firm involved Jerry Rosenbluth?
14   A. Two or three, maximum.
15   Q. How many of the cases in which you've been hired by
16 the Provost Umphrey firm involve Rex McLellan?
17   A. Two or three.
18   Q. In regard to Mr. Grubbs, Mr. McLellan and
19 Mr. Rosenbluth, are you aware of any of those individuals ever
20 working for a company that was engaged in the design, the
21 manufacture or the assembly of automobiles?
22   A. I'm not aware if they have.
23   Q. Okay. Are you aware of anyone who has suggested that
24 there is any design or manufacturing defect in the BMW 323i
25 vehicle in question that wasn't paid to say it?

## Page 31

1      MR. FISHER: Form.
2   A. No.
3   Q. You are not aware, for example, that there has been
4 any recall by the National Highway Traffic Safety
5 Administration of this vehicle due to crash worthiness concerns
6 or anything else?
7   A. Not that I'm aware of.
8   Q. Let's just get a little bit more of your testifying
9 background. You told us, I think, you testified over the years
10 you thought about ten times against General Motors?
11   A. Ballpark.
12   Q. I realize those are ballpark because we don't have
13 the records before us. How many times have you testified
14 against Ford?
15   A. Roughly the same.
16   Q. About ten times?
17   A. I would guess.
18   Q. How many times have you testified against Chrysler or
19 Daimler Chrysler?
20   A. Fewer but, you know - same order of magnitude, but my
21 sense is fewer times.
22   Q. Fewer being somewhere between five and ten or so?
23   A. Yes.
24   Q. How many about Mercedes-Benz? Have you ever
25 testified against Mercedes-Benz?

## Page 32

1   A. I think once.
2   Q. How about Volvo, have you ever testified against
3 Volvo?
4   A. I don't recall that I have.
5   Q. Volkswagen, have you ever testified against
6 Volkswagen?
7   A. Yes, several times, less than five.
8   Q. How many - have you ever testified against Porsche?
9   A. No.
10   Q. Have you ever testified against Lexus?
11   A. I don't recall.
12   Q. Have you ever testified against Honda?
13   A. Yes.
14   Q. How many times?
15   A. Perhaps - well, less than five.
16   Q. Have you ever testified against Mitsubishi?
17   A. Yes, same order of magnitude.
18   Q. Less than five?
19   A. Yes.
20   Q. How many times have you testified against Hyundai?
21   A. I don't think I have.
22   Q. How many times have you testified against Nissan?
23   A. Ten or less.
24   Q. Ten or 11 times?
25   A. Ten or less.

## Page 33

1   Q. Ten or less?
2   A. Uh-huh.
3   Q. Is that a "Yes"?
4   A. Yes, sorry.
5   Q. Let's just start over again. You've testified
6 against Nissan ten or less times?
7   A. Correct.
8   Q. All right. Are there any other automobile
9 manufacturers that you've testified against besides the ones we
10 just named?
11   A. BMW.
12   Q. Okay. How many times have you testified against BMW?
13   A. I'm currently involved in two cases, and there may
14 have been one or two other times.
15   Q. Okay. You are currently involved in the Garland
16 case?
17   A. Correct.
18   Q. Is there another BMW case that you are involved in?
19   A. No.
20   Q. So, when you said two cases, you are talking about
21 this one and Garland?
22   A. Correct.
23   Q. What other cases do you recollect being involved in
24 that involved BMW?
25   A. I just remember a case involving BMW a number of

---

**Page 34**

1  years ago, and I can't even remember what the issue was.
2      Q. Okay. But you were not hired by BMW in that case?
3      A. No, that's correct, was not.
4      Q. You were hired by plaintiffs who were suing BMW?
5      A. Yes.
6      Q. And you don't remember that case being a case where a
7  vehicle was alleged to have split apart when it was impacted on
8  the side?
9      A. I'm sure it was not the case.
10     Q. Do you recollect any case where you've ever been
11 hired and you've testified either by deposition or at trial
12 where there was a side impact and the vehicle, if you will, was
13 split in half or torn in half?
14     A. I have not.
15     Q. One of the things - you received, I believe, a duces
16 tecum in a deposition notice, did you not?
17     A. Yes.
18     Q. And one of the things that the duces tecum asked you
19 to do was to bring documents with you to your deposition.
20     A. Yes.
21     Q. Do you remember that the duces tecum - which I'm
22 going to find here sooner or later as I plow through the wrong
23 group - asked you to bring any publications that supported any
24 of your opinions or conclusions that you had in this case?
25     A. Yes.

---

**Page 35**

1      Q. Okay. Let me ask you this. Having looked through
2  your file, I do not see any peer-reviewed publications or other
3  publications which you brought to your deposition. Did I miss
4  something?
5      A. No, you didn't.
6      Q. Okay. Have you not brought any publications,
7  peer-reviewed or otherwise, that support any of the opinions or
8  conclusions that you have in the case?
9      A. No, because there are none published that
10 specifically address the issue.
11     Q. Let me go back and make sure we understand one
12 another, then. Number one, you have not brought any
13 peer-reviewed publications that support your opinions and
14 conclusions in this case because none exist, true?
15     A. None exist what?
16     Q. No such periodicals, literature, exist that support
17 your opinions or conclusions in this case?
18        MR. FISHER: Form.
19     A. Well, I think what I said was there are none that
20 specifically address this particular injury, injury type.
21 There are lots of documents that relate to head injuries, but
22 none in this specific type.
23     Q. Well, did you bring any peer-reviewed publications
24 that address or support any of the opinions or conclusions that
25 you intend to give at the trial of this case?

---

**Page 36**

1      A. No.
2      Q. Now, you talked about a head injury in this case. I
3  don't know why I can find that. You talked about no
4  publications addressed the head injuries that were involved in
5  this particular case. Is that because there are none that you
6  are aware of?
7      A. That's correct.
8      Q. Did you do sort of a search in order to find - to try
9  to find out whether or not there were any such publications
10 that existed?
11     A. I did.
12     Q. Describe your efforts for us, please.
13     A. I went through the latest SAE literature that would
14 specifically address anything related to, well, basilar
15 fractures, the skull basilar fractures associated with frontal
16 head deformations. And while there are ones that talk about
17 basal injuries, they are different directions. They are for
18 different purposes. So, I didn't feel that any of them were
19 really reflected exactly what this case represented.
20     Q. Exhibit 6 does include the notice duces tecum for
21 your deposition here today, does it not, Dr. Nicodemus?
22     A. Yes.
23     Q. Let's just visit about that a little bit. One of the
24 things we asked you to bring with you was a copy of any
25 technical paper, book, treatise or learned article authored in

---

**Page 37**

1  whole or in part by you which relates to the subjects about
2  which you intend to testify. Did you bring any such technical
3  paper, book, treatise or learned article authored by you?
4      A. No.
5      Q. Are there any that exist?
6      A. No.
7      Q. We asked that you also bring each and every document,
8  article, publication or paper authored by you on the subject of
9  design, manufacture, testing and assembly defects of
10 automobiles. You did not bring any such document with you
11 because none exist?
12     A. That's correct.
13     Q. We asked you to bring each and every document,
14 article publication and/or paper authored by you on the
15 subject of accident reconstruction. You did not bring any such
16 documents because none exist?
17     A. Correct.
18     Q. You have no degrees or certificates with the words
19 "accident reconstruction" on them?
20     A. Correct.
21     Q. You've never worked for a law enforcement agency?
22     A. No.
23     Q. For example, you've never been a consultant even to
24 the Texas Department of Public Safety or any police or law
25 enforcement departments in the State of Texas?

---

**Page 38**

1    A. Correct.
2    Q. And in regard to the subject of accident
3 reconstruction, you've not authored any papers on that topic?
4    A. That's correct.
5    Q. You've not taught the topic of accident
6 reconstruction to institutions of higher learning?
7    A. That's correct.
8    Q. We also asked that you bring each and every document,
9 article, publication and/or paper authored by you on the
10 subject of metallurgy. Have you not brought any documents
11 because there are none?
12    A. Correct.
13    Q. You are not a metallurgist?
14    A. Correct.
15    Q. I noticed in looking at your curriculum vitae which
16 was, I think, back here that there are a number of publications
17 and presentations and papers that you have given over the
18 years. Do any of those deal with head injuries?
19    A. No.
20    Q. And in regard to the head injuries sustained by
21 Taylor Hafstienn, if he had been brought into a hospital, you
22 would not have been either at the time of this accident or now
23 able to treat him because you do not have any medical license,
24 correct?
25    A. He was dead at the time.

**Page 39**

1    Q. If he had been alive, you would still not have been
2 able to treat him, correct?
3    A. I could have been involved in the treatment, yes.
4    Q. Under what auspice?
5    A. As a medical student I very often have treated people
6 in such cases in my recent experience.
7    Q. Before this accident, had you ever treated anybody as
8 a doctor?
9    A. No.
10    Q. And you are not licensed to provide medical treatment
11 to anybody in the State of Texas, are you?
12    A. Correct.
13    Q. For example, you are not a member of the Texas
14 Medical Association?
15    a. That's correct, I'm not.
16    Q. You are not eligible to be a member?
17    A. No.
18    Q. You are likewise not a member of the American Medical
19 Association, and you are not eligible to be a member?
20    A. Correct. I could be a student member if I chose.
21    Q. But you are not?
22    A. Correct.
23    Q. You are not a pathologist?
24    A. No.
25    Q. You've never personally performed an autopsy?

**Page 40**

1    A. Well, depends on how you define autopsy.
2    Q. Okay. Have you ever personally performed an autopsy?
3    A. How do you define autopsy?
4    Q. Okay. Let me ask you this. Have you ever worked as
5 a medical examiner?
6    A. Not as a medical examiner, no.
7    Q. Have you ever done an autopsy such as the one that
8 was performed on Taylor Hafstienn?
9    A. Again, depends on your definition. I have worked
10 very often with fresh cadavers in doing localized studies in
11 and around the head, nervous system, things like that where it
12 wasn't a matter of trying to determine what happened to this
13 individual but rather investigating things that had happened to
14 this individual as part of that study.
15    Q. You've never done an examination to determine the
16 cause of death?
17    A. Correct.
18    Q. You've never been the person responsible signing off
19 on a death certificate?
20    A. That's correct. I have not.
21    Q. Did you apply to any medical schools other than
22 Michigan State?
23    A. Yes, I did.
24    Q. Which ones did you apply to?
25    A. There is quite a list.

**Page 41**

1    Q. Let's hear some of them.
2    A. I applied to Harvard and Johns Hopkins, UCLA, USC and
3 several more, can't remember them all.
4    Q. Did you apply to any medical schools in the State of
5 Texas?
6    A. I did.
7    Q. Which ones?
8    A. I think all of them.
9    Q. Which ones?
10    A. I applied to U.T. Medical Branch in Galveston. Well,
11 the application process for Texas schools was different than
12 with all the rest of the schools in the country. You apply to
13 Texas schools period. You fill out a different form and you
14 check how many you want to apply to, and it goes to all of
15 them.
16    Q. Well, let me ask you this. Were you accepted in any
17 medical school in the State of Texas?
18    A. No.
19    Q. Were you accepted by Harvard or Johns Hopkins or UCLA
20 o USC?
21    A. No. I was accepted to the first one I applied to.
22       MR. MYERS: Objection, nonresponsive.
23    Q. (By Mr. Myers) My question right now is were you
24 accepted by Harvard, Johns Hopkins, UCLA or USC?
25    A. No.

Case 4:03-cv-01646   Document 108   Filed in TXSD on 01/20/05   Page 25 of 38

**Page 42**

1  Q. Did any of those schools reject your application?
2  A. No.
3  Q. Have you previously testified in other cases that, in
4  fact, you did have your applications rejected by other colleges
5  and universities?
6  A. Well, I guess it's terminology. They didn't reject
7  it. They didn't ask me in for a second review.
8  Q. Well, when they don't ask you in for a second review,
9  that's because you are not going to be accepted, correct?
10  A. Uh-huh, that's correct.
11  Q. So, in regard to Harvard, Johns Hopkins, UCLA, USC,
12  University of Texas Medical School and the other Texas medical
13  schools, none of those asked you in for a second interview?
14  A. That's correct.
15  Q. And by that, we can imply that you were rejected by
16  those schools as far as your admission to medical schools?
17  A. Not accepted, that's correct.
18  Q. And the school that you are attending now is
19  osteopathy school?
20  A. Osteopathic medical school, yes.
21  Q. And you are not an osteopath at this time?
22  A. Correct.
23  Q. Now, the company Bioforce that we see on some of
24  these documents, is that a company that is owned by you and
25  your wife?

**Page 43**

1  A. Yes.
2  Q. It's a corporation?
3  A. No.
4  Q. It's a sole proprietorship?
5  A. Yes.
6  Q. And it's principal offices are in the state of
7  Michigan?
8  A. Yes.
9  Q. Do you still get about ten cases a year?
10  A. Roughly, yes.
11  Q. And in regard to those cases, how many - what
12  percentage of the ten cases you get in per year are cases where
13  you've been asked to look at an automobile motor vehicle
14  accident and provide testimony?
15  A. There are probably 80 to 90 percent.
16  Q. What other type of products asides from automobiles?
17  We touched on this a little bit, but there are some other
18  products that you've testified against, have you not?
19  A. Yes.
20  Q. Just give us some of the other products that you've
21  testified against?
22  A. Well, motorcycles are one. Industrial-type accidents
23  are another. I recall one case of an elevator, another case of
24  a construction site. So, those sorts of things.
25  Q. Are you a member of the Association for the

**Page 44**

1  Advancement of Automotive Medicine?
2  A. Yes.
3  Q. When did you join that institution?
4  A. Two or three years ago.
5  Q. You've not held any offices in that association?
6  A. No.
7  Q. You've not presented any speeches or presentations to
8  that association?
9  A. Have not.
10  Q. In regard to the SAE, of course, you did not have to
11  take any test in order to become a member of the Society of
12  Automotive Engineers?
13  A. Correct.
14  Q. You have no degree in the field of automobile
15  engineering?
16  A. No.
17  Q. In the regard to the SAE, you've not held any
18  positions where you were an officer?
19  A. Correct.
20  Q. Are you a member of any subcommittees of the SAE?
21  A. No.
22  Q. Have you attended any of the SAE meetings?
23  A. Not in a while.
24  Q. When was the last time you attended an SAE meeting?
25  A. Must have been - well, more than three years, I know

**Page 45**

1  that - since I've been in school.
2  Q. Have you ever presented any papers to the SAE?
3  A. No, I haven't.
4  Q. And you've never published in any of the SAE
5  publications?
6  A. Have not.
7  Q. When were you hired in this case?
8  A. Seems like early February of this year.
9  Q. Early February of 2003?
10  A. Correct.
11  Q. And when did you first see either one of the two
12  vehicles that was involved in this accident?
13  A. I think a site visit here was April 2.
14  Q. So, less than a month ago or right at a month ago?
15  A. Right at.
16  Q. And the visit that you made to see either one of the
17  vehicles was to Beaumont, I presume?
18  A. Yes.
19  Q. And what you saw was a part of but not the entire BMW
20  323i vehicle?
21  A. Correct.
22  Q. You have never seen the Sierra pickup truck which
23  struck the BMW?
24  A. Correct.
25  Q. Have you seen any pictures of the Sierra pickup truck

| Page 46 | Page 47 |
|---|---|
| 1 aside from the photographs that we see in your file that were<br>2 taken at the accident site?<br>3     A. No.<br>4     Q. Have you done, therefore, any analysis of the crush<br>5 to the BMW vehicle -- Strike that.<br>6         Have you done any analysis of the crush to the Sierra<br>7 pickup truck?<br>8     A. I have not.<br>9     Q. Have you seen anyone else do such an analysis?<br>10     A. I think Tom Grubbs did an analysis.<br>11     Q. Have you done anything to verify Tom Grubbs' analysis<br>12 of the crush of the pickup truck?<br>13     A. I did not.<br>14     Q. Did you personally attempt to evaluate the crush to<br>15 the BMW?<br>16     A. Not quantitatively, no.<br>17     Q. I don't know what you mean by quantitatively, but let<br>18 me ask you this. Can you tell me, for example, how many inches<br>19 or how many feet of crush there was to, say, the rear seat<br>20 area?<br>21     A. I don't know.<br>22     Q. You did not --<br>23     A. I have no way of doing it.<br>24     Q. And you haven't. You don't know what it was?<br>25     A. Correct. | 1     Q. You know that certainly that the Sierra pickup truck<br>2 did intrude to some extent in the rear occupant area of the<br>3 BMW?<br>4     A. Well, again, I know it tore off the back end. I<br>5 don't know how much it intruded.<br>6     Q. And you've not been able to evaluate how much it<br>7 intruded?<br>8     A. Correct.<br>9     Q. And you've not seen the back end of the BMW?<br>10     A. Correct.<br>11     Q. Did you ever see the engine of the BMW?<br>12     A. No.<br>13     Q. Did you ever see the front passenger door for the<br>14 BMW?<br>15     A. Front passenger, no.<br>16     Q. Did you ever see any of the tires or wheels for the<br>17 BMW?<br>18     A. No.<br>19     Q. I gather you have not made an evaluation of the welds<br>20 either by location or otherwise for the BMW.<br>21     A. I was present during the inspection by others, Jerry<br>22 Rosenbluth and Rex McLellan as they did it, looked at the<br>23 specific areas of their concern, looked at blueprints provided<br>24 to compare. But that's the extent of it.<br>25     Q. Well, for example, if there are 4700 or so welds in |

| Page 48 | Page 49 |
|---|---|
| 1 the frame area alone, you certainly didn't closely inspect<br>2 every one of those welds?<br>3     A. I did not.<br>4     Q. Some of them you couldn't see unless you did some<br>5 destructive testing, I presume.<br>6     A. I assume that's true.<br>7     Q. Well, let me ask you this so we can short circuit<br>8 some of this. Are you intending to express an opinion as to<br>9 whether or not there was any defect in the design, the<br>10 manufacture or assembly of the BMW 323i vehicle?<br>11     A. No, other than the fact that it shouldn't have come<br>12 apart, typically.<br>13     Q. Well, what testing have you done in order to evaluate<br>14 whether or not a vehicle should or should not come apart?<br>15     A. I have done none.<br>16     Q. Have you done any testing in regard to this case?<br>17     A. No.<br>18     Q. And your report doesn't really say anything about a<br>19 design defect theory or a manufacturing defect opinion.<br>20 That's why I was asking you. Can I rely upon your report as<br>21 being all of the opinions and conclusions that you have<br>22 developed to date in this case?<br>23     A. Yes, you can.<br>24     Q. Now, you said that there was a time when you went<br>25 over - I think it was on April 2 - you visited the vehicle with | 1 Mr. Rosenbluth, Mr. McLellan and Mr. Grubbs.<br>2     A. Correct.<br>3     Q. Was there anyone else present aside from the four of<br>4 you during that visit?<br>5     A. No.<br>6     Q. How long did you stay with the vehicle or what was<br>7 left of the vehicle?<br>8     A. Several hours. I don't recall exactly how much time.<br>9     Q. Several hours being, I gather, more than two?<br>10     A. Yeah, two or three hours.<br>11     Q. Okay.<br>12     A. Something of that sort of.<br>13     Q. What did you personally do during that examination?<br>14     A. My interest was to understand as best I could the<br>15 kind of environment that the passengers were subjected to based<br>16 on what damage I saw to the vehicle. I looked at the driver's<br>17 compartment knowing that the driver sustained very few<br>18 injuries.<br>19     Q. Incapacitating injuries?<br>20     A. Incapacitating. She only had very few injuries. I<br>21 saw what was left of the rear aspect of that portion of the<br>22 vehicle, tried to discern what may have happened to the rear<br>23 part in terms of the passenger in the rear. Of course, it was<br>24 absent and not available. I was interested in how much<br>25 incursion may have occurred, not that I was measuring it to try |

| Page 50 |
| --- |

1 to analyze from a reconstruction standpoint. That was Tom
2 Grubbs' responsibility.
3    Q. While we are there, you have not reconstructed the
4 accident?
5    A. Correct.
6    Q. You've relied upon Mr. Grubbs to do that?
7    A. Correct.
8    Q. All right. Do you agree with Mr. Grubbs that Taylor
9 was ejected?
10    A. No, he was not.
11       MR. FISHER: Objection, form.
12    A. He was not.
13    Q. He was not. You've certainly seen both the February
14 5 and the April 21 reports and/or letters from Mr. Grubbs where
15 he expresses the opinion that Taylor Hafstienn was ejected,
16 correct?
17    A. Yes.
18    Q. He's wrong.
19    A. I know.
20    Q. Okay. Go ahead. You were talking about what you
21 were doing on April 2, 2003. You attempted to evaluate the
22 incursion but could not?
23    A. Correct. And, so, also was there to discuss and try
24 to understand what the theory was about how the vehicle parted,
25 where it parted and those sort of things. That's pretty much

| Page 51 |
| --- |

1 the extent of it.
2    Q. Did you make an evaluation as to the angle of impact
3 between the two vehicles?
4    A. No.
5    Q. Did you make a determination - well, did you go back
6 and attempt to verify any of the findings or opinions expressed
7 by Thomas Grubbs in either his February 5, 2003 report or his
8 April 21, 2003 letter or report?
9    A. The aspect of verification was one of my objectives,
10 and I saw that the impact was on the right side. I saw that it
11 was approximately at the B pillar, perhaps more rearward but I
12 can't tell because I don't have the rest of the vehicle. As I
13 said, I saw that the driver compartment was relatively
14 unaffected.
15    Q. Again, I'm asking you about what you did to verify
16 Thomas Grubbs' information that he set out in either his
17 February 5 or his April 21 letter reports.
18    A. Well, those were the aspects. So, again, it wasn't a
19 matter of trying to redo his calculations. It was simply to
20 verify in my mind by the vehicle the size and the sense of the
21 energy and the impact.
22    Q. For example, Mr. Grubbs does express a Delta V, does
23 he not?
24    A. Yes, he does.
25    Q. Have you attempted to verify whether or not his

| Page 52 |
| --- |

1 calculations that led to the Delta V expressed in his two
2 reports or one of his two reports, either the February 5 or the
3 April 21 one, was accurate?
4    A. I would have no way of determining if it was accurate
5 unless I go back and redo what he did.
6    Q. Okay. And you've not done that?
7    A. I've not done that.
8    Q. So, as far as whether or not the numbers for the
9 Delta V that Mr. Grubbs has come up with, whether or not those
10 are valid, not valid, is something that you have not
11 independently attempted to verify?
12    A. That's correct.
13    Q. Mr. Grubbs also comes up with proposed speeds at the
14 point of impact of the two vehicles. Have you done anything to
15 attempt to calculate the speeds either of the BMW or the GMC
16 pickup truck at the time of the impact?
17    A. I have not.
18    Q. You have received a copy of the accident
19 reconstruction for the Texas Department of Public Safety?
20    A. Yes, I have.
21    Q. You are aware that at least the Texas Department of
22 Public Safety's accident reconstruction team indicates that at
23 the time of the impact between the BMW and the GMC pickup
24 truck, the pickup truck was traveling at a rate of 73 miles per
25 hour?

| Page 53 |
| --- |

1    A. Yes.
2    Q. And your information - I gather you can't tell
3 because you can't see the rear of the vehicle, the full area of
4 impact between the two vehicles, correct?
5    A. That's correct.
6    Q. There is a lot of it missing?
7    A. Yes.
8    Q. And you've never seen any photographs of the missing
9 portion of the BMW except what we see in the accident site
10 photographs?
11    A. That's correct.
12    Q. Do you know where it is?
13    A. I don't know.
14    Q. Do you know any of the other missing components
15 of the BMW are?
16    A. I don't. All I know is there was reference to an
17 investigator here, Mr. Monk, I believe, tried to find it and
18 said that he could not.
19    Q. So, when you tell me that you believe that the impact
20 was behind the B pillar on the BMW, you can't tell me how far
21 behind the B pillar?
22    A. No. I think I said at the B pillar or slightly
23 behind, but I don't know for sure.
24    Q. And you don't know how slightly?
25    A. I don't.

Case 4:03-cv-01646   Document 108   Filed in TXSD on 01/20/05   Page 28 of 38

## Page 54

1  Q. Can you tell me that the impact was somewhere between
2  the B pillar and the C pillar?
3  A. Well, it encompassed the - an area from in front of
4  the B pillar to an area behind the B pillar. Now, how much
5  back, I don't know.
6  Q. Okay. You just can't even give us an estimate
7  because you haven't been able to see enough of the vehicle to
8  tell us?
9  A. Correct.
10  Q. Did you ever go to the accident site?
11  A. I did not.
12  Q. You've never been to the accident site?
13  A. No.
14  Q. Have you ever talked to Jessica Hafstienn?
15  A. No.
16  Q. Have you ever talked to Christopher Parson who is the
17  only eyewitness - at least the only one I know about?
18  A. No.
19  Q. Have you ever talked to any of the Texas Department
20  of Public Safety officers who were charged with either
21  investigating or reconstructing this accident?
22  A. I have not.
23  Q. Have you talked to - well, is there anyone that you
24  have talked to regarding this accident aside from the lawyers
25  that hired you and the other experts that those lawyers have

## Page 55

1  hired in this case?
2  A. I have talked to no one else.
3  Q. And as far as examining any physical evidence, the
4  only physical evidence you have examined was on April 2, 2003
5  when you spent approximately two to three hours looking at what
6  we have left of the BMW?
7  A. Correct.
8  Q. Have you ever gone out and found an exemplar BMW
9  323i?
10  A. Yes, I have.
11  Q. Did you take photographs of it?
12  A. Did not.
13  Q. Where did you find it?
14  A. In fact, it was in a parking lot. It was actually at
15  a restaurant in Lansing. I saw it and I said - in fact, it was
16  the same color. And I just walked around, looked at it to get
17  some sense of the rest of the vehicle, plus I looked it up -
18  photos on the internet just to see.
19  Q. But I'm talking about a real life other BMW 323i. Do
20  you know if that was the same model year?
21  A. I don't know about the model year.
22  Q. So, it's fair to say that you have never personally
23  sat in any rear seat position on a BMW 323i vehicle?
24  A. That's correct.
25  Q. You've never had another lawsuit involving BMW 323i

## Page 56

1  vehicle?
2  A. Correct.
3  Q. I call this an E464 series vehicle. Are you familiar
4  with that terminology?
5  A. No.
6  Q. Have you ever done - have any of your other accident
7  investigations where you've been hired as an expert involved a
8  Sierra GMC pickup truck like this one?
9  A. May have. It's a pretty common pickup, but I don't
10  know.
11  Q. Can you tell me as you sit here right now under oath
12  that you actually have been involved in a case involving a GMC
13  Sierra pickup truck?
14  A. No.
15  Q. The answer is no?
16  A. Correct.
17  Q. So, as far as trying to analyze another accident that
18  was substantially similar to this one, that's not something
19  you've done?
20  A. I've never seen another accident similar to this one.
21  Q. And you are not familiar with any publications or
22  literature that describes another accident similar to this one?
23  A. Correct.
24  Q. Did you ever look at any national data base for
25  purposes of trying to render any opinions or conclusions you

## Page 57

1  might have in this case?
2  A. No. My charge is not to look at - reconstruct the
3  accident.
4  Q. Well, statistically, however, did you look at - for
5  example, you know what FARS, F-A-R-S, is?
6  A. Federal Accident Research Statistics? I can't
7  recall.
8  Q. Fatal Accident Reporting System. I gather you didn't
9  look at it.
10  A. No.
11  Q. Do you know what the NNASS is?
12  A. National data base.
13  Q. You've not looked at that one in regard to this case?
14  A. No.
15  Q. So, you didn't attempt to do any sort of statistical
16  analysis of the probabilities of death for the purpose of this
17  case?
18  A. No.
19  Q. After you did your examination on April 2, 2003, what
20  else did you do in regard to this case?
21  A. After that, then I came back and looked at the
22  autopsy report in detail plus the photos - because that's
23  really all I have in terms of the biomechanical evidence from
24  the boy - and did my analysis based on those.
25  Q. Okay. You never, of course, saw Taylor Hafstienn.

## Page 58

1   A. No.
2   Q. You've never talked to any of the persons who were
3 involved in actually performing the autopsy?
4   A. No.
5   Q. Have you had any other cases which involved the death
6 of a person who was the approximate same age as Taylor
7 Hafstienn?
8   A. There have been at least one other child and - I
9 don't know - I would say is less than ten years old. I don't
10 know if it's exactly six years old as Taylor was, but --
11   Q. Is it on your list here, your Exhibit 4?
12   A. I don't think so. I think it was before this. I
13 don't recall the case.
14   Q. Do you remember what type of vehicle that child was
15 seated in?
16   A. I believe it was a Jaguar, actually. And that's one
17 vehicle that we didn't talk about.
18   Q. So, you've testified on behalf of plaintiffs who
19 brought a lawsuit seeking money damages against Jaguar?
20   A. Correct.
21   Q. Did you give a deposition in that case?
22   A. I don't think it went to deposition. I think it was
23 settled.
24   Q. So, you don't even remember giving a deposition in
25 the case, in the Jaguar case?

## Page 59

1   A. Correct.
2   Q. All right. Aside from that case, are you aware of
3 any other cases that involved a person of the approximate age
4 as Taylor Hafstienn at the time of this accident?
5   A. I don't recall any others.
6   Q. At the moment of impact, you express opinions, do you
7 not, that Taylor Hafstienn was seated in the rear, in a rear
8 passenger seat?
9   A. Yes.
10   Q. You express the opinion, do you not, that he was
11 seated in the - what I would call the right rear position
12 behind the passenger front seat?
13   A. Yes.
14   Q. In other words, you saw in her deposition where
15 Jessica Hafstienn indicated that while she didn't remember
16 exactly, she believed that he, Taylor, may have been seated
17 behind her in the rear seat?
18   A. I saw that in her deposition.
19   Q. And you don't think that's what happened?
20   A. Correct.
21   Q. At the moment of impact, do you have any information
22 as to where Taylor's head was located?
23   A. No. I assume it was located on his neck on his
24 shoulders.
25   Q. Well, my point is, was he looking to the right,

## Page 60

1 looking to the left, looking at the ground, do you know?
2   A. I have no idea.
3   Q. You don't know whether or not he had his head leaning
4 up against anything in the rear of the BMW or not?
5   A. Correct.
6   Q. Do you know whether or not he was even - whether he
7 was leaning over?
8   A. I do not.
9   Q. You do believe that he was belted?
10   A. Yes.
11   Q. The seatbelt worked fine?
12   A. Apparently.
13   Q. You have no criticism of the seatbelt?
14   A. No.
15   Q. The seatbelt, at least based upon your analysis,
16 functioned as it was intended to function?
17   A. Apparently.
18   Q. You do not intend to address air bags in this case?
19   A. No.
20   Q. Do you have any evidence that you can cite me to that
21 would disagree with the Texas Department of Public Safety's
22 estimate that at the time of the impact with the BMW the GMC
23 pickup truck was traveling at a rate of 73 miles an hour?
24   A. Do I have any evidence that would refute that?
25   Q. Yes, sir.

## Page 61

1   A. No.
2   Q. You've not done any analysis to attempt to either
3 verify or disagree with that?
4   A. No. The only other piece of evidence I have is Tom
5 Grubbs' report where he was a few miles per hour less than
6 that.
7   Q. Okay. There is no question in your mind, however,
8 that whether or not Mr. Grubbs is right or the Texas Department
9 of Public Safety is right, that this was a very severe high
10 speed impact?
11   A. Well, I know the rate of the travel of the pickup was
12 high. The Delta V, however, is not necessarily that high.
13         MR. MYERS: I object to that as nonresponsive.
14   Q. (By Mr. Myers) I'm not asking you about the Delta V
15 right now. It was a severe impact; would you agree with that?
16   A. Severe?
17   Q. You would agree that it was a high speed impact, at
18 least the impact between the pickup truck and the BMW?
19   A. Yes.
20         MR. FISHER: Form.
21   Q. Whether or not it was somewhere in the mid sixties or
22 whether or not it was as high as the mid seventies, you would
23 certainly describe either one of those as a high speed impact?
24   A. Yes.
25   Q. Have you looked - are you familiar with any place

Page 62

1 where you would go to look at statistics to see the fatality
2 rates for persons who are involved in accidents where one of
3 the vehicles is traveling at a rate of between 65 and 75 miles
4 an hour?
5    A. Well, that's - that's basically a loaded question
6 because it depends on the circumstance. One vehicle can be
7 traveling at a high rate of speed and it can be a glancing
8 blow. So, what do you mean? What conditions?
9    Q. What you are telling me basically is that every
10 accident is different?
11    A. Yes, it is.
12    Q. So, from an automobile manufacturing standpoint, you
13 can't anticipate, if you are a designer, what type of an
14 accident a particular vehicle might be in?
15        MR. FISHER: Form.
16    Q. True?
17    A. Well, absolutely.
18    Q. And certainly when you think about the various angles
19 of potential impact between one vehicle and another vehicle,
20 there are very, very, very many?
21    A. Well, it's basically quite a few because it could be
22 anywhere in a circle around another vehicle.
23    Q. And certainly no two accidents are identical?
24    A. Correct.
25    Q. None of the accidents, for example, that you've

Page 63

1 testified about on Exhibit 4 were identical to another
2 accident?
3    A. That's correct.
4    Q. The size of the vehicles, the weight of the vehicles,
5 the speeds of the vehicles, the roadways, the size of the
6 occupants, there are many, many variables in every accident?
7    A. Correct.
8    Q. In regard to this particular accident, do you know
9 what the height of Taylor Hafstienn was at the time of the
10 accident?
11    A. The height?
12    Q. How tall of a person he was.
13    A. About 4 feet.
14    Q. And do you know how much he weighed?
15    A. I think he was, as I recall - I'd have to look at the
16 autopsy report, but I think he was around 60 pounds, but I'd
17 have to see.
18    Q. Have you made any calculations in order to determine
19 the amount of time that the BMW and the pickup truck were
20 actually in contact with one another?
21    A. No, I have not.
22    Q. Do you know anybody that has?
23    A. Well, Tom Grubbs did the accident reconstruction
24 using a computer program. He would be the one to have the
25 closest information.

Page 64

1    Q. Are you aware of anybody else besides Mr. Grubbs that
2 did such work in regard to this case?
3    A. I don't know if the DPS did any work of that nature,
4 of the interaction between the vehicles. So - I don't know is
5 the answer.
6    Q. Did you look at any of the EDSMAC - computer
7 simulation of the impact between the BMW and the pickup truck
8 that Mr. Grubbs did?
9    A. I have not seen those results.
10    Q. Okay. So, those results have not played any part in
11 your opinions or conclusions, correct?
12    A. Correct.
13    Q. Have you independently attempted to verify
14 Mr. Grubbs' statement that the BMW was spun clockwise at a rate
15 of 400 degrees per second?
16    A. I have not.
17    Q. You do rely upon that number, do you not, in regard
18 to your analysis.
19    A. Actually, I don't use it in my analysis.
20    Q. Okay. Let me ask you this. Do you agree with this
21 statement out of Mr. Grubbs' report, "The EDSMAC trajectory
22 analysis leads to the conclusion that the young man was ejected
23 within the first one-fourth to one-half second, and the
24 distance from the ejection point to the blood spot is about 48
25 feet."

Page 65

1    A. The first part I would disagree with, that he was
2 ejected. He was not ejected, in my opinion. Secondly, the
3 blood spot was probably 48 feet from the point of impact. You
4 can pretty much measure that.
5    Q. But you haven't evaluated whether or not he's right
6 or wrong about that distance?
7    A. No.
8    Q. And you do believe that his statement about Taylor
9 being ejected is wrong?
10    A. Correct.
11    Q. Did you ever tell Mr. Grubbs that you believed he was
12 wrong?
13    A. When we were at the site inspection April 2, I asked
14 him if - based on his initial report, he stated that one person
15 was ejected, where he thought the ejection occurred. It was
16 after that, reading the accident report more closely, that
17 showed he was not ejected and subsequently the witness
18 statements that he was not ejected made it clear to me that he
19 was not ejected.
20    Q. Are you aware of any report that Mr. Grubbs has
21 written at any time since April 21, 2003 in order to correct
22 what you believe to be his erroneous statement about ejection?
23    A. I've seen none.
24    Q. In regard to - go back to his Delta V calculation.
25 Do you know whether or not that Delta V is longitudinal or

Page 66

1 lateral Delta V?
2     A. He doesn't specify the direction. I assume it's
3 basically a lateral one.
4     Q. But you don't really know?
5     A. But I don't know.
6     Q. And you don't really know what he did to calculate
7 that number?
8     A. I do not.
9     Q. So, as you sit here today, you are not putting the
10 stamp of approval on his Delta V and saying, yes, that's what
11 it is?
12     A. Well, the only stamp of approval that I put on it is
13 that the amount of vehicle deformation on the side, I think
14 just based on my experience without calculation, is of that
15 order of magnitude.
16     Q. Okay.  That's just from what, based upon what?
17     A. Having seen what a 30 to 40 mile an hour side impact
18 does to a vehicle, you know. It's unscientific. I guess my
19 frame of reference is to establish a range within my own mind
20 was this a gentle impact? No. Was it total energy of near 70
21 miles an hour into a brick wall type of impact. No, I don't
22 see that damage done to either vehicle. And I see where the
23 vehicles landed after the impact, they traveled quite a ways,
24 means a lot of energy was dissipated in rotation and subsequent
25 travel.

Page 67

1     Q. Have you evaluated that?
2     A. No, just by - just basic physics.
3     Q. Well, when you talk about that, though, there is that
4 methodology that I've seen in some other accidents and
5 therefore they didn't look - they look different to me when
6 we've already established that every accident is different.
7 Wouldn't you agree with me that that methodology is not one
8 that's published or considered to be scientifically reliable?
9         MR. FISHER:  Form.
10     A. Except that all vehicles no matter how different they
11 are are subject to the laws of physics. The laws of physics
12 include conservation of momentum, linear and angular momentum;
13 and the fact is that the pickup did not stick at the point of
14 impact nor did the BMW. That means there was motion afterwards
15 which means energy was dissipated afterwards.
16     Q. But you don't know how much?
17     A. I don't know how much. But I know that it was, if it
18 was, like, 3 feet, that would mean something different than if
19 it were a hundred feet down the road. It's more like a hundred
20 feet down the road. So, a substantial amount of energy went
21 into motion of the vehicles afterwards and not into deformation
22 of the car, either one.
23     Q. How many other cases have you seen where there was -
24 where one vehicle hit the other side impact going 73 miles an
25 hour?

Page 68

1     A. I don't know that I've seen one.
2     Q. So, you are seeing something and looking at
3 something - at least if that's true, you are seeing something
4 that you've not seen before, correct, as far as that kind of
5 speed?
6     A. As we've established, every accident is different.
7 I've never seen the next one of before.
8     Q. Have you ever personally viewed a Federal Motor
9 Vehicle Safety Standard test that was conducted pursuant to 214
10 of the FMVSS?
11     A. I don't know what 214 is.
12     Q. Let me ask you this. Have you ever seen or
13 participated in what is called a SIMCAP test?
14     A. No.
15     Q. Are you aware of what a SIMCAP test is?
16     A. No.
17     Q. Have you ever been personally present other than
18 litigation for litigation purposes where any sort of testing
19 has been done on an automobile?
20     A. Well, testing of what sort?
21     Q. Any kind of testing.  Well, fair enough. Have you
22 been personally present during any crash test involving an
23 automobile unrelated to litigation?
24     A. Yes.
25     Q. Okay.  Tell me about that.

Page 69

1     A. There were - there was a series of car-truck crashes
2 conducted, I think, out at A & M campus some years ago - how
3 many years ago I don't recall - where we were looking at how
4 much speed was - how much speed from the vantage point of the
5 struck automobile was necessary to cause significant occupant
6 acceleration given the striking vehicle was a semi, and these
7 are relatively low speeds.  That was the only occasion.
8     Q. Okay.  Were you actually just an observer, or were
9 you actually participating in the crash test?
10     A. I was an observer.
11     Q. And in regard to those cash tests, they were not done
12 pursuant to any federal motor safety standard?
13     A. Correct.
14     Q. And they were not being performed by an automobile
15 manufacturer in order to determine anything about his vehicles?
16     A. Correct.
17     Q. Have you ever either in the litigation setting or
18 otherwise observed or participated in a crash test involving a
19 side impact?
20     A. No.
21     Q. Now, when you were looking at the BMW, you didn't
22 take any measurements?
23     A. I did not.  This case?
24     Q. Yes, I'm talking about this. I moved back to where
25 we were. You didn't take any measurements of the BMW?

## Page 70

1     A. Did not.
2     Q. You didn't make any calculations regarding the BMW?
3     A. No.
4     Q. You couldn't see all of the deformation?
5     A. Correct.
6     Q. You can't tell me exactly what the degree of
7  intrusion was by the pickup truck into the rear occupancy
8  compartment of the BMW?
9     A. Only in the case of the half that was present.
10    Q. So, you can't - again, you can tell me from what
11  you've seen, but you don't know what the rest of the vehicle
12  would show you?
13    A. Correct.
14    Q. You cannot tell me what the degree of intrusion is
15  of the grill of the pickup truck into the side of the BMW?
16    A. No, but I can tell you that I don't think it was a
17  significant incursion.
18           MR. MYERS: I object to everything after "No".
19    Q. (By Mr. Myers) What do you base your statement on
20  that you do not believe it was a significant intrusion?
21    A. Based on the injuries of the child.
22    Q. Is that the only basis?
23    A. That's it.
24    Q. As far as the methodology that you have used in
25  regard to this case, where is that published?

## Page 71

1     A. In every technical library in the country.
2     Q. Why didn't you bring any of them with you?
3     A. Because I couldn't carry the Library of Congress with
4  me.
5     Q. Could you have brought one of them with you?
6     A. What difference does it make? They all say the same
7  things. Laws of physics are the laws of physics.
8     Q. Which laws of physics have you relied upon?
9     A. Well, there are certain fundamental laws of physics,
10  force equals MA, conservation of momentum, so on and so forth.
11    Q. Are there any variances within the conservation of
12  momentum theory?
13    A. What do you mean, variances?
14    Q. Different numbers.
15    A. Well, the law is the law. Yes, every case is
16  different, and every - as you said, every vehicle different.
17  Weight, speeds are different. Before impact situation is
18  different than after impact situation is different and so on.
19    Q. Let me ask you this. Where in the published
20  literature - and I'm looking for biomechanical, perhaps,
21  published literature - that addresses an impact to the head
22  such as we see with Taylor Hafstienn? Where is that published?
23    A. The SAE publishes number of tests done on cadavers
24  and on animals, primates as well as smaller animals.
25    Q. You've not brought any of that literature with you?

## Page 72

1     A. No, I didn't.
2     Q. Does any of it support your opinions in this case?
3     A. Well, yes and no. Yes in that that body of
4  literature talks about the facts that cranial bones can be
5  fractured. We know that without going to a book.
6     Q. Well, a cranial bone can be fractured due to an
7  impact with the grill of a pickup truck.
8     A. Sure, it can.
9     Q. Can be fractured due to an impact within the BMW?
10    A. Yes, it can.
11    Q. It can be fractured due to some sort of an impact
12  with the roadway?
13    A. Yes, it can.
14    Q. It can be fractured due to something flying around in
15  the vehicle?
16    A. Yes, it can. I don't know of any book that tells me
17  any of those things - except I have to find it based on my own
18  analysis.
19    Q. Well, your analysis, what is that comprised of? What
20  did you actually analyze? You didn't do any calculations at
21  all, did you?
22    A. No.
23    Q. You didn't take any measurements?
24    A. No.
25    Q. You didn't do any sort of a statistical search?

## Page 73

1     A. No.
2     Q. So, what did you do as far as your analysis?
3     A. Well, if I can refer to a document here. I'm
4  referring to Defendant's Exhibit 13.
5     Q. Which is what?
6     A. It is medical examiner report and photographs.
7     Q. Okay. What did you do in regard to the medical
8  examiner's report and photographs besides look at them and read
9  it?
10    A. Well, from this they determined what side the impact
11  to the head was.
12    Q. All right.
13    A. Second thing I determined is that - and basically,
14  fundamentally, the impact to the head was from the left side
15  slightly frontal but primarily from the left side. Second
16  part --
17    Q. That's not something you've independently done.
18  You've looked at the autopsy report, and it tells you that,
19  right?
20    A. No, I did it independently using the photographs
21  provided.
22    Q. Which photographs did you rely upon?
23    A. Well, many of them.
24    Q. Which ones did you rely upon for your belief that
25  the - that the impact was to the left side? Just tell me the

| Page 74 | Page 75 |
|---|---|

**Page 74**

1 number.
2  A. 6, 7, 8, 9, 10, 11, 12, 14.
3  Q. What is it about the photographs that makes you
4 believe that there was an impact to the left side?
5  A. Deformation of the bone and its contents.
6  Q. Aside from looking at the pictures, the photographs
7 of the autopsy, and the autopsy report, what else did you look
8 at in order to arrive at any opinion and conclusion you have in
9 this case?
10  A. Well, that's all the information I have available
11 about the injuries to the deceased.
12  Q. All right.
13  A. So, given that's all we have available, that's pretty
14 much all I can study to analyze.
15  Q. So, what have you done as far as analysis or study
16 that was not already done for you by the medical examiner's
17 office?
18  A. The medical examiner described in medical terms what
19 he observed.
20  Q. All right.
21  A. What I see in the photographs are evidence of
22 deformation in terms of direction which is the key point here.
23  Q. Okay. Is that something that the medical examiner
24 did not do?
25  A. Correct.

**Page 75**

1  Q. Do you agree with everything that is contained in the
2 autopsy report?
3  A. Well, I have no way to disagree with it.
4  Q. Well, let me ask it this way. Is there anything with
5 which you disagree contained in the autopsy report?
6  A. No.
7  Q. Aside from looking at the autopsy report and the
8 photographs from the autopsy, what else have you relied upon in
9 regard to arriving at the opinions and conclusions that you
10 have in this case?
11   MR. FISHER: Form.
12  A. Well, in a way of any physical evidence, that's all I
13 have.
14  Q. Let me ask you this. Have you made an evaluation as
15 to the G levels that would have been imposed on Taylor
16 Hafstienn at the point of initial impact?
17  A. No.
18  Q. Have you made an analysis of the G levels that would
19 have been imposed upon Jessica Hafstienn at the time of the
20 initial impact?
21  A. I have not.
22  Q. Were the G levels to the child higher or lower than
23 the G levels to the vehicle?
24   MR. FISHER: Form.
25  Q. Or do you know?

| Page 76 | Page 77 |
|---|---|

**Page 76**

1  A. G levels to the child higher than to the vehicle?
2  Q. Right, or lower.
3  A. I can't answer the question.
4  Q. Okay. Let me ask you this. As far as the crash
5 itself is concerned, we've talked about the fact that it's
6 severe. We've talked generally about the portion of the BMW
7 that you can see was crushed. But aside from telling me that
8 it was a severe accident and that it was at a relatively high
9 rate of speed, at least by the pickup truck, what else do you
10 know about the crash itself that you've done as far as an
11 analysis is concerned?
12  A. About the physical matter of the vehicle, vehicle
13 interaction?
14  Q. Yes, sir.
15  A. Nothing.
16  Q. For example, can you tell us exactly what the BMW did
17 from the moment it was impacted until the point it got to its
18 final resting place based on any analysis that you've done?
19  A. I've done no analysis of the accident, vehicle
20 analysis, reconstruction. So, I can't tell you.
21  Q. Okay. So, as far as, then, as the rotation, the
22 rotational direction of any component of the BMW, did you make
23 an analysis of that?
24  A. No.
25  Q. I presume, then, based upon what you just told me you

**Page 77**

1 cannot describe the movement of the BMW.
2  A. The only movement I can describe is that the rear
3 portion after impact, after separating from the front portion,
4 at some point in its trajectory turned upside down exposing the
5 child's head to the pavement.
6  Q. How do you know it turned upside down?
7  A. Because it was found upside down by police in
8 photographs and was described that way by the one witness we
9 have.
10  Q. And there is a reference to a blood stain on the
11 roadway.
12  A. Yes.
13  Q. You've never personally seen that?
14  A. I have not.
15  Q. You've not seen an analysis of that blood?
16  A. I have not.
17  Q. As far as an analysis of the blood, you've not seen
18 anything that says that - where there is an analysis of the
19 blood that says that that's Taylor Hafstienn's blood type?
20  A. I only have six police officers' opinion that that's
21 the case.
22   MR. MYERS: Objection, nonresponsive.
23  Q. (By Mr. Myers) You've not seen any analysis that
24 says that the blood is the same blood type as Taylor Hafstienn?
25  A. That's correct.

Page 78

1   Q. As far as the police officers are concerned, you are
2   not aware that any of those police officers actually observed
3   the accident?
4   A. That's correct.
5   Q. You are aware that there are descriptions of Jessica
6   Hafstienn as being covered with blood after the accident?
7        MR. FISHER: Form.
8   A. I'm not aware of that.
9   Q. Can you tell me whether the BMW rolled over, at what
10  point in its travel?
11  A. I cannot.
12  Q. Okay. So, you can't tell me exactly when it came to
13  rest?
14  A. No.
15  Q. Aside --
16  A. Only where it came to rest.
17  Q. And your basis for where it came to rest is solely by
18  looking at the photographs of the accident?
19  A. And the DPS report.
20       MR. MYERS: Let's take a break.
21
22            (1:27)
23
24       (WHEREUPON, THERE WAS A BREAK IN THE
25       PROCEEDINGS, AFTER WHICH THE TESTIMONY

Page 79

1        RESUMED AS FOLLOWS:)
2
3            (1:32)
4
5   Q. (By Mr. Myers)  I am looking at your report dated
6   April 25, 2003 that we have marked as Exhibit No. 1.  You say
7   that, "Based on my site inspection and photographs taken by the
8   DPS shortly after the accident, the Hafstienn vehicle was
9   struck on its right side by a '96 GMC Sierra pickup truck
10  driven by Ross Hardin."  Your site inspection, that's not to
11  suggest that you went to the accident site?
12  A. Correct.  That's the vehicle site, should have been
13  vehicle.
14  Q. So, when we see that in other paragraphs of your
15  report, we should simply understand that is your inspection for
16  between two and three hours on April 2, 2003 of a portion of
17  the BMW?
18  A. Correct.
19  Q. Okay.  So, you start out by saying that, "Based upon
20  the accident report and the photographic evidence of the
21  coroner's report," I presume you are talking about the autopsy.
22  A. Yes.
23  Q. And when I asked you questions about whether or not
24  you've ever worked for a medical examiner's office, I guess
25  what we call the medical examiner or coroner, you've never

Page 80

1   worked for a coroner or a medical examiner?
2   A. That's correct.
3   Q. You've never held that position?
4   A. Correct.
5   Q. Okay. In any event, you believe that based upon that
6   information that Taylor Hafstienn was belted in the right rear
7   seat at the time of the impact, correct?
8   A. Correct.
9   Q. Other than looking at the police photos and your view
10  of the vehicle, you have no other information about how the
11  vehicle split into two pieces?
12  A. No, I have none.
13  Q. Are you aware of whether or not at any time before
14  the BMW actually reached its final resting place that it was
15  actually split into two pieces?
16       MR. FISHER: Form.
17  A. I need to have you rephrase that.
18  Q. Let me ask you this. When I took Thomas Grubbs'
19  deposition the other day, he expressed the belief that the Jaws
20  of Life actually had to separate some portion of the vehicles.
21       MR. FISHER: Form
22  A. I have not seen that. So, I have no independent
23  information.
24  Q. Well, is it fair enough to say that based upon your
25  examination, you don't know exactly when during the accident

Page 81

1   sequence the BMW split into two pieces if, in fact, it ever
2   occurred during the accident sequence?
3        MR. FISHER: Form.
4   A. Correct.
5   Q. Okay. And you say that the split into two pieces was
6   just rear of the front seat?
7   A. Correct.
8   Q. What do you base that on?
9   A. Well, what's left of the - what I saw, what's left of
10  the vehicle.
11  Q. So, would it be fair to say that based only on what
12  you saw that was left of the vehicle and without having the
13  benefit of seeing the remainder of the vehicle, the best you
14  can say is that the split occurred just rear of the front seat?
15  A. That's correct.
16  Q. But it could have occurred further back, too?
17  A. Well --
18       MR. FISHER: Form.
19  A. Well, I didn't measure it in inches, how far to the
20  rear of the front seat.  What I know is the front seat is still
21  in the front part of the vehicle.  The back seat is missing.
22  So, it split after the front seat.
23  Q. Did the split appear to you to take any particular
24  line?
25  A. I didn't evaluate that.

Page 82

1    Q. Nothing that you could just take a look at and say,
2 "Oh, yeah, it went down this certain obvious line of the
3 vehicle"?
4    A. No.
5    Q. Did you see torn sheet metal?
6    A. Lots of torn sheet metal.
7    Q. Did you see some ripped up welds?
8    A. Yes.
9    Q. Is there anything that would surprise you about torn
10 sheet metal and ripped up welds if one vehicle is going 73
11 miles an hour and hits the other one in the side?
12    A. No.
13    Q. Why do you believe that Taylor was in the right rear
14 position?
15    A. Based on two things, actually. Both of them come out
16 of the medical examiner's report, the autopsy, and photos
17 contained therein. One being what are described as - what I
18 agree with appear to look like bruises on the boy's chest,
19 diagonal, you can see them on Photograph 1 and I think
20 Photograph 20, yes.
21    Q. Now, you say that based upon statements of
22 investigating and accident reconstruction officers Taylor
23 remained belted in the rear portion of the vehicle as it
24 rotated and skidded away from the impact point. What statement
25 from an investigating and accident reconstruction officer told

Page 83

1 you that?
2    A. It's in the affidavits of the police officers.
3    Q. Okay. Did they describe the rotation or skidding
4 away from the impact point?
5    A. No.
6    Q. Tell me all the movements that Taylor's head made
7 from the moment that the pickup truck first touched the BMW.
8    A. I have no way of telling you that.
9    Q. The injury or injuries that you see to his head were
10 cranial fractures, right?
11    A. Correct.
12    Q. Okay. And certainly you would agree that if somehow
13 his head had come into contact with the grill or some other
14 part of the GMC pickup truck, that that could cause a cranial
15 fracture?
16    A. It could, but the direction is wrong.
17       MR. MYERS: Objection, nonresponsive.
18    Q. (By Mr. Myers) How do you know which way his head
19 was at the time the pickup truck hit him?
20    A. Doesn't matter. He can't turn his head that far.
21    Q. How do you know that? What have you done to test
22 that?
23    A. Well, he was an alive, well, boy and he physically
24 can't turn his head 270 degrees or 180 degrees, let's say.
25 Nobody can.

Page 84

1    Q. Was he looking - you to don't know whether he was
2 looking to the other side of the vehicle or looking up at his
3 mama or looking --
4    A. Doesn't matter.
5    Q. Excuse me. Let me finish. Or looking at the pickup
6 truck as it was coming at him, do you?
7       MR. FISHER: Form.
8    A. Doesn't matter.
9       MR. MYERS: Objection, nonresponsive.
10    Q. (By Mr. Myers) Do you know what he was doing?
11    A. I don't know, but it doesn't matter.
12       MR. MYERS: Objection, nonresponsive.
13    Q. (By Mr. Myers) Can you have a crushing, shearing
14 type of impact to a cranium by impact with a pickup truck?
15    A. Sure, you can, but it's the wrong direction.
16       MR. MYERS: Objection, nonresponsive.
17    Q. (By Mr. Myers) What is it about the report - I'm
18 not going to ask you about the photographs yet - about the
19 report itself, the medical examiner's autopsy report, does it
20 say it was a crushing, shearing type of impact?
21    A. It does not.
22    Q. So, your only basis for saying it was a crushing,
23 shearing type of impact is the photographs?
24    A. Correct.
25    Q. As far as the - you say that the impact forced the

Page 85

1 upper levels of the cranium past the lower portions being
2 directed roughly from front to back. Is that part of what the
3 medical examiner reported?
4    A. No.
5    Q. Is that something that you believe you see in the
6 photographs?
7    A. Yes.
8    Q. Is there anything other than the photographs that
9 support that theory?
10    A. No.
11    Q. Does the medical examiner's autopsy report indicate
12 that the crushing was directed roughly from front to back with
13 the left side more extensively damaged than the right?
14    A. Not specifically but implied.
15    Q. Okay. Let me ask you this. There was damage to the
16 right side of the head?
17    A. No.
18    Q. There wasn't?
19    A. Correct. There were minor aspects of this to the
20 right side.
21    Q. Were there any fractures at all to the right side of
22 the head?
23    A. There are fractures on the right side, but they
24 originate from the left.
25    Q. And what medical publication, peer-reviewed, could I

**Page 86**

1 go to that would describe a crushing, shearing type of impact
2 such as you describe here in Paragraph 5 of your April 25, 2003
3 report?
4    A. I'm sure you could find one that talks about trauma
5 to the head.
6    Q. I'm asking you to find me one. Can you identify any
7 one peer-reviewed publication that would discuss that for me as
8 you sit here right now?
9    A. No. But if you want one, I'll give you ten when I
10 get home.
11      MR. MYERS: Objection, nonresponsive.
12    Q. (By Mr. Myers) So, you didn't bring anything like
13 that to your deposition?
14    A. Correct.
15    Q. The petrous portion of the left temporal bone was
16 fractured. How many times have you ever actually personally
17 been present when you saw a petrous portion of the left
18 temporal bone being fractured in a person?
19    A. Only once.
20    Q. When was that?
21    A. Probably - this is 2003. Must be six or seven years
22 ago.
23    Q. Okay. What kind of an accident was that?
24    A. It was not an accident.
25    Q. What kind of an event was that?

**Page 87**

1    A. I had a cranium that I had in the laboratory, and I
2 had an interest in looking at - I think it was not related to a
3 case, litigation, but there was a question about forces or
4 direction of impacts related to petrous bone, temporal bone
5 fractures. And I loaded one up in the laboratory, and took a
6 look at how it fractured.
7    Q. Was that an adult?
8    A. Yes, it was.
9    Q. Let me ask you this. Where in the peer-reviewed
10 published literature can you direct me to discussions of what
11 constitutes a severe impact?
12    A. Are you reading from my report?
13    Q. Yes, sir, I am. I'm reading from Paragraph 5 of your
14 report.
15    A. Paragraph 5?
16    Q. Yes, sir, at the very end, talking about a severe
17 impact to the head.
18    A. Well, you won't find a medical description anywhere,
19 but this certainly qualifies as severe. Same way we are
20 discussing about the impact to a vehicle. It's kind of a
21 subjective thing.
22      MR. MYERS: Objection, nonresponsive.
23    Q. (By Mr. Myers) My question was about identifying or
24 citing me to any peer-reviewed publications, and you are not
25 aware of any peer-reviewed publication that addresses the

**Page 88**

1 severity or degrees of head impacts?
2    A. Sure, there are.
3    Q. But you didn't bring those with you?
4    A. No. They are more in the realm of neurosurgery where
5 they classify types of fractures like facial fractures and
6 others, and they put numbers on them to indicate types of bones
7 and the amount of deformation and so on.
8    Q. So, have you done that? Have you established a
9 severity number for this head impact?
10    A. No, I have not. There is not one that fits this
11 particular category that I'm aware of.
12    Q. And you can't tell me by date or publication or
13 author any particular publication that addresses that?
14      MR. FISHER: Form.
15    A. I'm not aware of that.
16    Q. And you are not a neurosurgeon?
17    A. I am not.
18    Q. It says "A Nicodemus/Wagner partnership." What is
19 that?
20    A. That's just what we refer to our company.
21    Q. Who is Wagner?
22    A. That's my wife.
23    Q. Okay. So, when I asked you about it being a sole
24 proprietorship earlier, it's actually a partnership?
25    A. It's a sole proprietorship jointly owned, if you want

**Page 89**

1 to call it that. It's not officially a partnership in that
2 sense.
3    Q. But you call yourself a partnership at the bottom of
4 your report?
5    A. Yes, we do.
6    Q. You've never done any testing to determine severity
7 ratings to forehead impacts?
8    A. No, I have. There is - well, there is literature
9 that relates specific kinds of fractures, for example, SAE
10 articles of that literature that talk about facial kinds of
11 fractures, frontal bone, some temporal, zygomatic, nasal bones,
12 and how much force it takes to cause those because they are
13 related to steering wheels and A pillars and that sort of
14 thing.
15    Q. Was that testing you've done?
16    A. No.
17    Q. Maybe you misunderstood. I was asking about testing
18 that you had actually personally performed.
19    A. I'm sorry. I misunderstood. I have done no testing.
20    Q. You've not published in any peer-reviewed literature
21 anything about severity of impacts to head?
22    A. No.
23    Q. Okay. Let's go to the next page of your report. You
24 mention that Taylor among other things had multiple long bone
25 fractures on the right side.

Page 90

1    A. Yes.
2    Q. Which bones were fractured on the right side? You
3 say the right humerus?
4    A. Humerus.
5    Q. What is that?
6    A. What the humerus is?
7    Q. Right.
8    A. That's the upper arm.
9    Q. What struck Taylor's upper arm or what did his upper
10 arm strike?
11    A. Probably it was struck by the incursion of the
12 vehicle, struck by the interior aspects of the right passenger
13 door as caused by incursion of the striking vehicle.
14    Q. So, you believe that the fracture of the right
15 humerus was probably caused either by the door crush from the
16 BMW or the pickup truck itself?
17    A. Correct.
18    Q. You say that also there was a fracture of the
19 proximal tibia. What is that?
20    A. The tibia is the bone that - one of the two that
21 connects to the lower part of the leg that connect at the knee.
22    Q. And what do you believe the tibia either struck or
23 was struck by in order to break it?
24    A. Same, incursion of the vehicle, the side, the door.
25    Q. So, one or the other, either the vehicle itself, that

Page 91

1 being the pickup truck or the crush of the BMW due to the
2 impact?
3    A. Correct.
4    Q. Okay. There is also - you say there is a fracture to
5 the right fibula.
6    A. Correct.
7    Q. What is the fibula?
8    A. Fibula goes right along with the tibia. They both
9 connect at the knee down to the ankle.
10    Q. And it would be your testimony that based upon at
11 least your review of the accident and the records that the
12 break of the right fibula would have been caused either by the
13 pickup truck itself or by the crush of the BMW?
14    A. Correct.
15    Q. What portion of the BMW would the tibia and the
16 fibula have struck?
17    A. The door.
18    Q. Okay. You say both clavicles were broken.
19    A. Correct.
20    Q. How did that happen?
21    A. Impact on the shoulder, right shoulder.
22    Q. You say both clavicles were broken, right?
23    A. Yes.
24    Q. So, where do you think - what impacted the right
25 clavicle to break it or what did the right clavicle impact?

Page 92

1    A. Same, the door.
2    Q. The door of the vehicle, of the BMW?
3    A. Well, some aspect of the door itself or material on
4 the door or if he was in a car seat, the car seat being forced
5 by the door, something of that nature.
6    Q. You don't have any information he was in a car seat,
7 do you?
8    A. I know that there was a car seat somewhere involved.
9 I don't know if he was in one or not.
10    Q. Certainly if he was in a car seat, that would have
11 changed his location in the vehicle?
12    A. Well, if he's in a car seat as opposed to sitting on
13 the seat.
14    Q. Exactly. So, as far as how high his head sat up, how
15 close his feet and legs and arms were to the door, that would
16 have made a difference?
17    A. Yes, some difference there.
18    Q. And you don't know whether or not he was just seated
19 in the right rear position or seated in a car seat in the right
20 rear position?
21    A. Correct.
22    Q. Did you see a child's car seat when you examined the
23 vehicle?
24    A. Not in the vehicle. I don't see any in the DPS
25 pictures.

Page 93

1    Q. You also say that - okay. You said he broke both
2 clavicles. How did he break his left clavicle?
3    A. Well, clavicle is kind of an s-shaped bone. If you
4 press on the end of it as in a shoulder impact, it will cause
5 it to snap; and the force transferred from one to the other can
6 cause both of them to snap.
7    Q. You think that's what happened here?
8    A. Yes.
9    Q. So, you think the force was imposed either by the
10 pickup truck actually striking him or the door being struck -
11 some portion of the BMW door on the right side that caused his
12 right clavicle to snap which forced the left clavicle to snap,
13 too?
14    A. I think that same force is what caused both of them.
15    Q. All right. And you say there is a broken left rib 1.
16 How did the left rib 1 get broken?
17    A. Could be from the seatbelt. Oh, the upper - I'm
18 sorry. Rib 1 is right up associated with the left clavicle.
19 So, it's probably the same.
20    Q. Same thing. In other words, you think that the
21 strike from the right, whatever the source, was sufficient to
22 break not only the right clavicle but also the left clavicle
23 and left rib 1?
24    A. Correct.
25    Q. Last, you say that there is a fracture to the left

Page 94

1 femur what is the femur?
2    A. Femur is the thigh bone.
3    Q. What caused that?
4    A. I don't know.
5    Q. You say there are other injuries. There is a
6 contusion and superficial laceration to the liver.
7    A. Yes.
8    Q. Was the liver actually exposed?
9    A. No.
10    Q. What caused the laceration to the liver?
11    A. Impact, abdominal impact, again, right side.
12    Q. Okay. So, again, when we've been talking about
13 either the actual pickup truck itself or the door of the BMW
14 would have struck him with sufficient force that there was a
15 laceration to the liver?
16    A. Yes.
17    Q. You say a serosal hematoma around the distal
18 esophagus and proximal stomach. What caused that?
19    A. Probably the same, seatbelt. Possibly both of those
20 could be seatbelt related. But in any event, it's caused by
21 the impact to the right, most likely from the right.
22    Q. And is it fair, then, to say that given the nature of
23 those injuries, that Taylor was right in the line of fire as
24 far as the impact?
25    A. Well, he was relatively close, yes.

Page 95

1    MR. FISHER: Form.
2    Q. And you can't tell us exactly - you could not draw us
3 a drawing, for example, based upon your examination and
4 analysis and tell us exactly the angle of the impact and where
5 Taylor would have been seated in regard to that impact?
6    A. No, I cannot.
7    Q. Aside from telling us that you believe that he struck
8 some portion of the BMW door, are you aware of any other
9 interactions between Taylor Hafstienn and the structure of the
10 BMW?
11    A. I'm not aware of any.
12    Q. The restraints - what were the restraints for your
13 right rear occupant for the BMW?
14    A. Well, what I see is a shoulder harness, shoulder
15 belt, lap belt.
16    Q. Did you examine - were you able to examine the
17 shoulder harness or the lap belt for the right rear position?
18    A. No. That portion of the vehicle was absent.
19    Q. Before the BMW was torn in two, did any part of the
20 pickup drive through the back seat space?
21    A. I don't know.
22    Q. What would be the possible sources of head strikes
23 for Taylor's head from the moment that the pickup truck hits
24 the vehicle until --
25    A. Right side window, C pillar or that general - the

Page 96

1 frame of the door, frame of the window, I suppose the vehicle
2 itself can come through the window.
3    Q. And as far as the - just going back to the C pillar
4 and the frame of the door, you haven't seen those components?
5    A. Not of the accident vehicle.
6    Q. That's what I'm talking about. So, you can't, for
7 example, take a look at that portion of the vehicle in order to
8 evaluate whether or not there is some sort of a dent that you
9 could attribute to a strike with Taylor's head or not?
10    A. Yeah. I would not expect to see one based upon the
11 pattern of the fractures.
12    MR. MYERS: Objection, nonresponsive.
13    Q. My point is you have not been able to see the C
14 pillar or the frame of the right rear door or the other
15 components of the vehicle in that area in order to see whether
16 or not there any sort of dents that you might attribute to
17 Taylor's head?
18    A. That's correct, I have not seen it.
19    Q. If I understand your theory, Taylor at the time that
20 you believe his head made impact with the roadway already had a
21 fractured right humerus, a fractured proximal tibia, a
22 fractured right fibula, fractures to both clavicles, a fracture
23 to his left rib 1, a fracture to his left femur, a laceration
24 to his liver and a serosal hematoma around the distal esophagus
25 and proximal stomach?

Page 97

1    A. Repeat the first part of your question.
2    Q. As I understand your theory, it is that at the time
3 that Taylor Hafstienn's head made contact with whatever caused
4 his cranial fractures, that he already had a broken right
5 humerus, a broken proximal tibia, a broken right fibula, two
6 broken clavicles, a broken left rib 1, a broken left femur, a
7 contusion and laceration to his liver and a serosal hematoma
8 around the distal esophagus and proximal stomach.
9    A. Yes.
10    Q. What would have been available for Taylor's head to
11 strike in the rear of the BMW?
12    MR. FISHER: Form.
13    A. He's seated on the right side in the rear seat. It
14 would have been the right side of the interior of that rear
15 compartment meaning, as we said earlier, frame around the door,
16 C pillar.
17    Q. What about from the rear?
18    A. Well, he's probably short enough he just has a seat,
19 seat back.
20    Q. What about if he's in a car seat?
21    A. Well, the car seat still won't - the distance between
22 his head and the next available hard object is roof and rear
23 window. Those are substantially far enough that in his
24 restraint seat position he wouldn't reach those.
25    Q. Have you tried to measure those at least in another